CONSOLIDATED EDISON CO. ET AL. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.*

No. 19. Argued October 14, 17, 1938.—Decided December 5, 1938.

---

*Together with No. 25, *International Brotherhood of Electrical Workers et al.* v. *National Labor Relations Board et al.*, also on writ of certiorari to the Circuit Court of Appeals for the Second Circuit.

198

200

202

*Mr. William L. Ransom* for petitioners in No. 19.

204

206

208

*Mr. Charles Fahy,* with whom *Solicitor General Jackson,* and *Messrs. Robert L. Stern, Charles A. Horsky, Robert B. Watts,* and *Laurence A. Knapp* were on the brief, for the National Labor Relations Board.

212

*Mr. Isaac Lobe Straus,* with whom *Mr. Claude A. Hope* was on the brief, for petitioners in No. 25.

214

*Mr. Joseph A. Padway* for petitioners in No. 25.

216

*Mr. Louis B. Boudin* for the United Electrical and Radio Workers of America, intervening respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The United Electrical and Radio Workers of America, affiliated with the Committee for Industrial Organization, filed a charge, on May 5, 1937, with the National Labor Relations Board that the Consolidated Edison Company of New York and its affiliated companies were interfering with the right of their employees to form, join or assist labor organizations of their own choosing and were contributing financial and other support, in the manner described, to the International Brotherhood of Electrical Workers, an affiliate of the American Federation of Labor. The Board issued its complaint and the employing companies, appearing specially, challenged its jurisdiction. On the denial of their request that this question be determined initially, the companies filed answers reserving their jurisdictional objections. After the taking of evidence before a trial examiner, the proceeding was transferred to the Board, which on November 10, 1937, made its findings and order.

The order directed the companies to desist from labor practices found to be unfair and in violation of § 8 (1) and (3) of the National Labor Relations Act,[1] directed reinstatement of six discharged employees with back pay, and required the posting of notices to the effect that the companies would cease the described practices and that their employees were free to join or assist any labor or-

---

[1] 49 Stat. 449; 29 U. S. C. §§ 158 (1) (3).

ganization for the purpose of collective bargaining and would not be subject to discharge or to any discrimination by reason of their choice.   4 N. L. R. B. 71.

It appeared that between May 28, 1937, and June 16, 1937, the companies had entered into agreements with the International Brotherhood of Electrical Workers and its local unions, providing for the recognition of the Brotherhood as the collective bargaining agency for those employees who were its members, and containing various stipulations as to hours, working conditions, wages, etc., and for arbitration in the event of disputes.   The Board found that these contracts were executed under such circumstances that they were invalid and required the companies to desist from giving them effect.   *Id.*   At the same time the Board decided that the companies had not engaged in unfair labor practices within the meaning of § 8 (2) of the Act.[2]   That clause makes it an unfair labor practice to "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it."   Accordingly the order dismissed the complaint, so far as it alleged a violation of § 8 (2), without prejudice.   *Id.*

The companies petitioned the Circuit Court of Appeals to set aside the order and a petition for the same purpose was presented by the Brotherhood and its locals.   These labor organizations had not been parties to the proceeding before the Board but intervened in the Court of Appeals as parties aggrieved by the invalidation of their contracts.   The Board in turn asked the court to enforce the order.   The United Electrical and Radio Workers of America appeared in support of the Board.   The court granted the Board's petition.   95 F. 2d 390.   We issued writs of certiorari upon applications of the companies (No. 19) and of the Brotherhood and its locals (No. 25).

[2] 29 U. S. C. 158 (2).

The questions presented relate (1) to the jurisdiction of the Board; (2) to the fairness of the hearing; (3) to the sufficiency of the evidence to sustain the findings of the Board with respect to coercive practices, discrimination and the discharge of employees; and (4) to the invalidation of the contracts with the Brotherhood and its locals.

The pertinent facts will be considered in connection with our discussion of these questions.

*First. The jurisdiction of the Board.*—That is, was the proceeding within the scope of its authority validly conferred? The petitioning companies constitute an integrated system. With the exception of one company which maintains underground ducts for electrical conductors in New York City, they are all public utilities engaged in supplying electric energy, gas and steam (and certain by-products) within that City and adjacent Westchester County. The enterprise is one of great magnitude. The companies serve over 3,500,000 electric and gas customers,—a large majority using the service for residential and domestic purposes. In 1936 the companies supplied about 97.5 per cent. of the total electric energy sold in the City of New York and about one hundred per cent. of that sold in Westchester County. They do not sell for resale without the State. They have about 42,000 employees, their total payrolls in 1936, with retirement annuities and separation allowances, amounting to nearly $82,000,000.

Petitioners urge that these predominant intrastate activities, carried on under the plenary control of the State of New York in the exercise of its police power, are not subject to federal authority. It does not follow, however, because these operations of the utilities are of vast concern to the people of the City and State of New York, that they do not also involve the interests of interstate and foreign commerce in such a degree that the Federal

Government was entitled to intervene for their protection. For example, the governance of the intrastate rates of a railroad company may be of great importance to the State and an appropriate object of the exertion of its power, but the Federal Government may still intervene to protect interstate commerce from injury caused by intrastate operations and to that end may override intrastate rates and supply a dominant federal rule. *The Shreveport Case,* 234 U. S. 342; *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563; *New York* v. *United States,* 257 U. S. 591. See, also, *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 37–41.

In the present instance we may lay on one side, as did the Circuit Court of Appeals, the mere purchases by the utilities of the supplies of oil, coal, etc., although very large, which come from without the State and are consumed in the generation and distribution of electric energy and gas. Apart from those purchases, there is undisputed and impressive evidence of the dependence of interstate and foreign commerce upon the continuity of the service of the petitioning companies. They supply electric energy to the New York Central Railroad Company, the New York, New Haven and Hartford Railroad Company, and the Hudson and Manhattan Railroad Company (operating a tunnel service to New Jersey) for the lighting and operation of passenger and freight terminals, and for the movement of interstate trains. They supply the Port of New York Authority with electric energy for the operation of its terminal and the Holland Tunnel. They supply a majority of the piers of transatlantic and coastwise steamship companies along the North and East Rivers, within the City of New York, for lighting, freight handling and related uses. They serve the Western Union Telegraph Company, the Postal Telegraph Company, and the New York Telephone Com-

pany with power for transmitting and receiving messages, local and interstate. They supply electric energy for the transatlantic radio service of the Radio Corporation of America. They provide electric energy for the Floyd Bennett Air Field in Brooklyn for various purposes, including field illumination, a radio beam and obstruction lighting. Under contracts with the Federal Government they supply electric energy for six lighthouses and eight beacon or harbor lights; also light, heat and power for the general post office and branch post offices, the United States Barge Office, the Customs House, appraisers' warehouse and various federal office buildings.

It cannot be doubted that these activities, while conducted within the State, are matters of federal concern. In their totality they rise to such a degree of importance that the fact that they involve but a small part of the entire service rendered by the utilities in their extensive business is immaterial in the consideration of the existence of the federal protective power. The effect upon interstate and foreign commerce of an interruption through industrial strife of the service of the petitioning companies was vividly described by the Circuit Court of Appeals in these words: "Instantly, the terminals and trains of three great interstate railroads would cease to operate; interstate communication by telegraph, telephone, and radio would stop; lights maintained as aids to navigation would go out; and the business of interstate ferries and of foreign steamships, whose docks are lighted and operated by electric energy, would be greatly impeded. Such effects we cannot regard as indirect and remote." 95 F. 2d 390, 394.

If industrial strife due to unfair labor practices actually brought about such a catastrophe, we suppose that no one would question the authority of the Federal Government to intervene in order to facilitate the settlement of the dispute and the resumption of the essential service to inter-

state and foreign commerce. But it cannot be maintained that the exertion of federal power must await the disruption of that commerce. Congress was entitled to provide reasonable preventive measures and that was the object of the National Labor Relations Act.

Congress did not attempt to deal with particular instances. It created for that purpose the National Labor Relations Board. In conferring authority upon that Board, Congress had regard to the limitations of the constitutional grant of federal power. Thus, the "commerce" contemplated by the Act (aside from that within a Territory or the District of Columbia) is interstate and foreign commerce. The unfair labor practices which the Act purports to reach are those affecting that commerce. § 10 (a).[3] In determining the constitutional bounds of the authority conferred, we have applied the well-settled principle that it is the effect upon interstate or foreign commerce, not the source of the injury, which is the criterion. It is not necessary to repeat what we said upon this point in the review of our decisions in the case of *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., supra.* And whether or not particular action in the conduct of intrastate enterprises does affect that commerce in such a close and intimate fashion as to be subject to federal control, is left to be determined as individual cases arise. *Id.,* see, also, *Santa Cruz Packing Co.* v. *National Labor Relations Board,* 303 U. S. 453, 466, 467.

Petitioners urge that the legislature of New York has enacted comprehensive and adequate measures to protect against the interruption of petitioners' services through labor disputes. Not only has the State long had legislation relating to the operations of public utility companies (Public Service Law) but the legislature has recently enacted the New York State Labor Relations

---

[3] 29 U. S. C. 160 (a).

Act (Laws of 1937, Chapter 443, effective July 1, 1937; Article 20 of the Labor Law) which provides a complete supervision of labor relations for employers in intrastate enterprises similar to that set up by the National Labor Relations Act with respect to interstate or foreign commerce. The state act, with added details, follows closely the national act. The state act provides for collective bargaining, including the conduct of elections to determine the representation of employees, and empowers the state Labor Relations Board to prevent unfair labor practices. In seeking to avoid a clash with federal authority, the state act is made inapplicable "to the employees of any employer who concedes to and agrees with the board that such employees are subject to and protected by the provisions of the national labor relations act or the federal railway labor act." [4] It is manifest that the enactment of this state law could not override the constitutional authority of the Federal Government. The State could not add to or detract from that authority. But it is also true that where the employers are not themselves engaged in interstate or foreign commerce, and the authority of the National Labor Relations Board is invoked to protect that commerce from interference or injury arising from the employers' intrastate activities, the question whether the alleged unfair labor practices do actually threaten interstate or foreign commerce in a substantial manner is necessarily presented. And in determining that factual question regard should be had to all the existing circumstances, including the bearing and effect of any protective action to the same end already taken under state authority. The justification for the exercise of federal power should clearly appear. *Florida* v. *United States*, 282 U. S. 194, 211, 212. But the question in such a case would relate not to the existence of the federal

[4] New York State Labor Relations Act, § 715.

power but to the propriety of its exercise on a given state of facts.

In the instant case, not only was this proceeding instituted before the New York Labor Relations Act became effective but, so far as appears, no proceedings have been taken under it in relation to the unfair labor practices here alleged. For the present purpose, it is sufficient to say that there has been no exertion of state authority which can be taken to remove the need for the exertion of federal authority to protect interstate and foreign commerce. The exercise of the federal power to protect interstate and foreign commerce from injury does not depend upon a clash with state action and need not await the exercise of state authority.

We conclude that the Board had authority to entertain this proceeding against the petitioning companies.

*Second. The fairness of the hearing,—procedural due process.*—Apart from the action of the Board with respect to the Brotherhood contracts, which we shall consider separately, the contentions under this head relate (1) to amendments of the complaint, (2) to the refusal to hear certain witnesses, and (3) to the transfer of the proceeding to the Board and its determination without an intermediate report or opportunity for hearing upon proposed findings.

The original complaint related to the discharge of five employees and alleged unfair labor practices in the employment of industrial spies and undercover operatives, in allowing employees to solicit membership in the Brotherhood during working hours and on the property of the companies, in compensating such employees while so engaged and in furnishing them office space and financial assistance while refusing such privileges to the United, and generally in coercion of the employees to join the

Brotherhood. The amendments were made from time to time in the course of the hearing. In particular, they added another employee to those alleged to have been wrongfully discharged and supplied an omitted allegation that the other unfair labor practices affected commerce. At the close of the evidence the trial examiner granted a motion to conform the pleadings to the proof on the statement of the attorney for the Board that no important change was intended and that the amendment was sought merely to make more definite and certain what appeared in the complaint. These were discretionary rulings which afford no ground for challenging the validity of the hearing.

A more serious question grows out of the refusal to receive the testimony of certain witnesses. The taking of evidence began on June 3, 1937, and was continued from time to time until June 23d when the attorney for the Board unexpectedly announced that its case would probably be closed on the following day. At that time the Board completed its proof, with the reservation of one matter, and at the request of the companies' counsel the hearing was adjourned until July 6th in order that Mr. Carlisle, the chairman of the board of trustees of the Consolidated Edison Company, and Mr. Dean, the vice president of one of its affiliates, who were then unavailable, could testify. In response to the examiner's inquiry, the companies' counsel stated that the direct examination of all witnesses on their behalf would not occupy more than a day. On July 6th the testimony of Mr. Carlisle and Mr. Dean was taken and the companies also offered the testimony of two other witnesses (then present in the hearing room) in relation to the discharge of the employee with respect to whom the complaint had been amended as above stated. The examiner refused to receive this testimony following a ruling of the Board (made in the

course of correspondence with the companies' counsel during the adjournment) to the effect that no other testimony than that of Mr. Carlisle and Mr. Dean would be received on the adjourned day. An offer of proof was made which showed the testimony to be highly important with respect to the reasons for the discharge. It was brief and could have been received at once without any undue delay in the closing of the hearing.

We agree with the Court of Appeals that the refusal to receive the testimony was unreasonable and arbitrary. Assuming, as the Board contends, that it had a discretionary control over the conduct of the proceeding, we cannot but regard this action as an abuse of discretion. But the statute did not leave the petitioners without remedy. The court below pointed to that remedy, that is, to apply to the Court of Appeals for leave to adduce the additional evidence; on such an application and a showing of reasonable grounds the court could have ordered it to be taken. § 10 (e) (f).[5] Petitioners did not avail themselves of this appropriate procedure.

Shortly after the evidence was closed, the counsel for the petitioning companies filed a brief with the trial examiner. Several weeks later, on September 29th, the proceeding was transferred to the Board. The examiner made no tentative report or findings and there was no opportunity for a hearing before the Board itself. It must be assumed, however, that the brief for the companies was transmitted to the Board and was considered by it in making its decision. The Board contends that the companies submitted their brief without asking for an oral argument, as contemplated by the Board's rule (Rule 29), or for an intermediate report, and hence that they are not in a position to complain on either score.

[5] 29 U. S. C. 160(e)(f).

The Board also insists that after the transfer of the proceeding, it was within the discretion of the Board to adopt any one of the courses of procedure enumerated in its rule (Rule 38)[6] of which petitioners were informed by the

[6] Rules 37 and 38 are as follows:

"Sec. 37. Whenever the Board deems it necessary in order to effectuate the purposes of the Act, it may permit a charge to be filed with it, in Washington, D. C., or may, at any time after a charge has been filed with a Regional Director pursuant to Section 2 of this Article, order that such charge, and any proceeding which may have been instituted in respect thereto—

"(a) be transferred to and continued before it, for the purpose of consolidation with any proceeding which may have been instituted by the Board, or for any other purpose; or

"(b) be consolidated for the purpose of hearing, or for any other purpose, with any other proceeding which may have been instituted in the same region; or

"(c) be transferred to and continued in any other Region, for the purpose of consolidation with any proceeding which may have been instituted in or transferred to such other Region, or for any other purpose.

"The provisions of Sections 3 to 31, inclusive, of this Article shall, in so far as applicable, apply to proceedings before the Board pursuant to this Section, and the powers granted to Regional Directors in such provisions shall, for the purpose of this Section, be reserved to and exercised by the Board. After the transfer of any charge and any proceeding which may have been instituted in respect thereto from one Region to another pursuant to this Section, the provisions of Sections 3 to 36, inclusive, of this Article, shall apply to such charge and such proceeding as if the charge had originally been filed in the Region to which the transfer is made.

"Sec. 38. After a hearing for the purpose of taking evidence upon the complaint in any proceeding over which the Board has assumed jurisdiction in accordance with Section 37 of this Article, the Board may—

"(a) direct that the Trial Examiner prepare an Intermediate Report, in which case the provisions of Sections 32 to 36, inclusive, of this Article shall in so far as applicable govern subsequent procedure, and the powers granted to Regional Directors in

service of a copy of the Board's rules at the beginning of the proceeding. Petitioners say that at the very outset they had asked, on their special appearance, for a hearing before the Board upon the question of its jurisdiction and that all proceedings be transferred to the Board, and that the rules induced the belief that after the transfer to the Board at the close of the evidence there would be further proceedings at which they would be heard. But we cannot say that the rules justified that expectation or dispensed with the necessity, after the transfer, of a suitable request by the petitioners for such additional hearing as they desired. It does not appear that such request was made.

It cannot be said that the Board did not consider the evidence or the petitioners' brief or failed to make its own findings in the light of that evidence and argument. It would have been better practice for the Board to have directed the examiner to make a tentative report with an opportunity for exceptions and argument thereon. But, aside from the question of the Brotherhood contracts, we find no basis for concluding that the issues and contentions were not clearly defined and that the petitioning companies were not fully advised of them. *National Labor Relations Board* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333, 350, 351. The points raised as to the lack

such provisions shall for the purpose of this Section be reserved to and exercised by the Board; or

"(b) decide the matter forthwith upon the record, or after the filing of briefs or oral argument; or

"(c) reopen the record and receive further evidence, or require the taking of further evidence before a member of the Board, or other agent or agency; or

"(d) make other disposition of the case.

"The Board shall notify the parties of the time and place of any such submission of briefs, oral argument, or taking of further evidence."

of procedural due process in this relation cannot be sustained.

*Third. The sufficiency of the evidence to sustain the findings of the Board with respect to coercive practices, discrimination and discharge of employees.*—The companies contend that the Court of Appeals misconceived its power to review the findings and, instead of searching the record to see if they were sustained by "substantial" evidence, merely considered whether the record was "wholly barren of evidence" to support them. We agree that the statute, in providing that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive," means supported by substantial evidence. *Washington, V. & M. Coach Co. v. National Labor Relations Board,* 301 U. S. 142, 147. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Appalachian Electric Power Co. v. National Labor Relations Board,* 93 F. 2d 985, 989; *National Labor Relations Board v. Thompson Products,* 97 F. 2d 13, 15; *Ballston-Stillwater Co. v. National Labor Relations Board,* 98 F. 2d 758, 760. We do not think that the Court of Appeals intended to apply a different test. In saying that the record was not "wholly barren of evidence" to sustain the finding of discrimination, we think that the court referred to substantial evidence. *Ballston-Stillwater Co. v. National Labor Relations Board, supra.*

The companies urge that the Board received "remote hearsay" and "mere rumor." The statute provides that "the rules of evidence prevailing in courts of law and equity shall not be controlling."[7] The obvious purpose of this and similar provisions is to free administrative

---

[7] § 10(b); 29 U. S. C. 160(b).

boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. *Interstate Commerce Comm'n* v. *Baird,* 194 U. S. 25, 44; *Interstate Commerce Comm'n* v. *Louisville & Nashville R. Co.,* 227 U. S. 88, 93; *United States* v. *Abilene & Southern Ry. Co.,* 265 U. S. 274, 288; *Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420, 442. But this assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence.

Applying these principles, we are unable to conclude that the Board's findings in relation to the matters now under consideration did not have the requisite foundation. With respect to industrial espionage, the companies say that the employment of "outside investigating agencies" of any sort had been voluntarily discontinued prior to November, 1936, but the Board rightly urges that it was entitled to bar its resumption. Compare *Federal Trade Comm'n* v. *Goodyear Tire & Rubber Co.,* 304 U. S. 257, 260. In relation to the other charges of unfair labor practices, the companies point to the statement of Mr. Carlisle at a large meeting of the employees in April, 1937, when the recognition of the Brotherhood was under discussion, that the employees were absolutely free to join any labor organization,—that they could do as they pleased. Despite this statement and assuming, as counsel for the companies urges, that where two independent labor organizations seek recognition, it cannot be said to be an unfair labor practice for the employer merely to express preference of one organization over the other, by reason of the former's announced policies, in the absence of any attempts at intimidation or coercion, we think that there was still substantial evidence that such attempts were made in this case.

It would serve no useful purpose to lengthen this opinion by detailing the testimony. We are satisfied that the provisions of the order requiring the companies to desist from the discriminating and coercive practices described in subdivisions (a) to (e) inclusive and in subdivision (h) of paragraph one of its order,[8] and to reinstate the six employees mentioned with back pay, and to post notices assuring freedom from discrimination and coercion as provided in paragraph two of the order, rested upon findings sustained by the evidence and that the decree of the Court of Appeals enforcing the order in these respects should be affirmed.

*Fourth. The Brotherhood contracts.*—The findings of the Board that the contracts with the Brotherhood and its locals were invalid, and the Board's order requiring the companies to desist from giving effect to these contracts, present questions of major importance. We approach them in the light of three cardinal considerations. One is that the Brotherhood and its locals are labor organi-

---

[8] These provisions of the order in substance required the companies to desist from discouraging membership in the United or encouraging membership in the Brotherhood, or any other labor organization of their employees, by discharges, or threats of discharge, or refusal of reinstatement, because of membership or activity in connection with any such labor organization; from permitting representatives of the Brotherhood to engage in activities in its behalf during working hours or on the employers' property unless similar privileges were granted to the United and all other labor organizations; from permitting employees who were officials of the Employees' Representation Plans to use the employers' time, property and money in behalf of the Brotherhood or any other labor organization; from employing detectives to investigate the activities of their employees in behalf of the United or other labor organizations, or employing for such purpose any other sort of espionage; and from "in any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join or assist labor organizations" or to bargain collectively or to engage in concerted activities for that purpose or other mutual aid or protection.

zations independently established as affiliates of the American Federation of Labor and are not under the control of the employing companies. So far as there was any charge, under § 8 (2) of the Act, that the employing companies had dominated or interfered with the formation or administration of any labor organization or had contributed financial or other support to it, the charge was dismissed. Another consideration is that the contracts recognize the right of employees to bargain collectively; they recognize the Brotherhood as the collective bargaining agency for the employees who belong to it, and the Brotherhood agrees for itself and its members not to intimidate or coerce employees into membership in the Brotherhood and not to solicit membership on the time or property of the employers. The third consideration is that the contracts contain important provisions with regard to hours, working conditions, wages, sickness, disability, etc., and also provide against strikes or lockouts and for the adjustment and arbitration of labor disputes, thus constituting insurance against the disruption of the service of the companies to interstate or foreign commerce through an outbreak of industrial strife. It is not contended that these provisions are unreasonable or oppressive but on the contrary it was virtually conceded at the bar that they are fair to both the employers and employees. It also appears from the evidence, which was received without objection, that the Brotherhood and its locals comprised over 30,000, or 80 per cent of the companies' employees out of 38,000 eligible for membership.

The Brotherhood and its locals contend that they were indispensable parties and that in the absence of legal notice to them or their appearance, the Board had no authority to invalidate the contracts. The Board contests this position, invoking our decision in *National Labor Relations Board* v. *Pennsylvania Greyhound Lines*, 303

U. S. 261. That case, however, is not apposite as there no question of contract between employer and employee was involved. The Board had found upon evidence that the employer had created and fostered the labor organization in question and dominated its administration in violation of § 8(2). The statement that the "Association" so formed and controlled was not entitled to notice and hearing was made in that relation. *Id.,* pp. 262, 270, 271. It has no application to independent labor unions such as those before us. We think that the Brotherhood and its locals having valuable and beneficial interests in the contracts were entitled to notice and hearing before they could be set aside. *Russell* v. *Clark's Executors,* 7 Cranch, 69, 96; *Mallow* v. *Hinde,* 12 Wheat. 193, 198; *Minnesota* v. *Northern Securities Co.,* 184 U. S. 199, 235; *Garzot* v. *de Rubio,* 209 U. S. 283, 297; *General Investment Co.* v. *Lake Shore & M. S. Co.,* 260 U. S. 261, 285. The rule, which was applied in the cases cited to suits in equity, is not of a technical character but rests upon the plainest principle of justice, equally applicable here. See *Mallow* v. *Hinde, supra.*

The Board urges that the National Labor Relations Act does not contain any provision requiring these unions to be made parties; that § 10(b)[9] authorizes the Board to serve a complaint only upon persons charged with unfair labor practices and that only employers can be so charged. In that view, the question would at once arise whether the Act could be construed as authorizing the Board to invalidate the contracts of independent labor unions not before it and also as to the validity of the Act if so construed. But the Board contends that the Brotherhood had notice, referring to the service of a copy of the complaint and notice of hearing upon a local union of the Brotherhood on May 12, 1937, and of an amended notice of hear-

[9] 29 U. S. C. 160(b).

ing on May 25, 1937. Petitioners rejoin that the service was not upon a local whose rights were affected but upon one whose members were not employees of the companies' system. The Board says, however, that the Brotherhood, and the locals which were involved, had actual notice and hence were entitled to intervene, § 10 (b), and chose not to do so. But neither the original complaint—which antedated the contracts—nor the subsequent amendments contained any mention of them, and the Brotherhood and its locals were not put upon notice that the validity of the contracts was under attack. The Board contends that the complaint challenged the legality of the companies' "relations" with the Brotherhood. But what was thus challenged cannot be regarded as going beyond the particular practices of the employers and the discharges which the complaint described. In these circumstances it cannot be said that the unions were under a duty to intervene before the Board in order to safeguard their interests.

The Board urges further that the unions have availed themselves of the opportunity to petition for review of the Board's order in the Court of Appeals, and that due process does not require an opportunity to be heard before judgment, if defenses may be presented upon appeal. *York* v. *Texas,* 137 U. S. 15, 20, 21; *American Surety Co.* v. *Baldwin,* 287 U. S. 156, 168; *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 384. But this rule assumes that the appellate review does afford opportunity to present all available defenses, including lack of proper notice, to justify the judgment or order complained of. *Id.*

Apart from this question of notice to the unions, both the companies and the unions contend that upon the case made before the Board it had no authority to invalidate the contracts. Both insist that that issue was not actually litigated, and the record supports that contention. The argument to the contrary, that the con-

tracts were necessarily in issue because of the charge of unfair labor practices against the companies, is without substance. Not only did the complaint as amended fail to assail the contracts but it was stated by the attorney for the Board upon the hearing that the complaint was not directed against the Brotherhood; that "no issue of representation (was) involved in this proceeding"; and that the Board took the position that the Brotherhood was "a *bona fide* labor organization" whose legality was not attacked. But the Board says that on July 6th (the last of the contracts having been made on June 16th) the companies amended their answer stating that the making of the contracts had rendered the proceeding moot, and that this necessarily put the contracts in issue. We cannot so regard it. We think that the fair construction of the position thus taken on the last day of the hearings was entirely consistent with the view that the validity of the contracts had not been, and was not, in issue. And the counsel for the companies point to their brief before the Board, which they produce, as proceeding on the basis that the validity of the contracts had not been assailed.

Further, the Act gives no express authority to the Board to invalidate contracts with independent labor organizations. That authority, if it exists, must rest upon the provisions of § 10 (c).[10] That section authorizes the Board, when it has found the employer guilty of unfair labor practices, to require him to desist from such practices "and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." We think that this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose

---

[10] 29 U. S. C. 160 (c).

because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.

The power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act. The continued existence of a company union established by unfair labor practices or of a union dominated by the employer is a consequence of violation of the Act whose continuance thwarts the purposes of the Act and renders ineffective any order restraining the unfair practices. Compare *National Labor Relations Board* v. *Pennsylvania Greyhound Lines, supra.* Here, there is no basis for a finding that the contracts with the Brotherhood and its locals were a consequence of the unfair labor practices found by the Board or that these contracts in themselves thwart any policy of the Act or that their cancellation would in any way make the order to cease the specified practices any more effective.

The Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining. Under § 7 [11] the employees of the companies are entitled to self-organization, to join labor organizations and to bargain collectively through representatives of their own choosing. The 80 per cent. of the employees who were members of the Brotherhood and its locals, had that right. They had the right to choose the Brotherhood as their representative for collective bargaining and to have contracts made as the result of that bargaining. Nothing that the employers had done deprived them of that right. Nor did the contracts make the Brotherhood and its locals exclusive repre-

[11] 29 U. S. C. 157.

sentatives for collective bargaining. ·On this point the contracts speak for themselves. They simply constitute the Brotherhood the collective bargaining agency for those employees who are its members. The Board by its order did not direct an election to ascertain who should represent the employees for collective bargaining. § 9 (c).[12] Upon this record there is nothing to show that the employees' selection as indicated by the Brotherhood contracts has been superseded by any other selection by a majority of employees of the companies so as to create an exclusive agency for bargaining under the statute, and in the absence of such an exclusive agency the employees represented by the Brotherhood, even if they were a minority, clearly had the right to make their own choice. Moreover, the fundamental purpose of the Act is to protect interstate and foreign commerce from interruptions and obstructions caused by industrial strife. This purpose appears to be served by these contracts in an important degree. Representing such a large percentage of the employees of the companies, and precluding strikes and providing for the arbitration of disputes, these agreements are highly protective to interstate and foreign commerce. They contain no terms which can be said to "affect commerce" in the sense of the Act so as to justify their abrogation by the Board. The disruption of these contracts, even pending proceedings to ascertain by an election the wishes of the majority of employees, would remove that salutary protection during the intervening period.

The Board insists that the contracts are invalid because made during the pendency of the proceeding. But the effect of that pendency would appropriately extend to the practices of the employers to which the complaint was addressed. See *Jones* v. *Securities & Exchange Comm'n*, 298 U. S. 1, 15. It did not reach so far as to suspend

[12] 29 U. S. C. 159 (c).

the right of the employees to self-organization or preclude the Brotherhood as an independent organization chosen by its members from making fair contracts on their behalf.

Apart from this, the main contention of the Board is that the contracts were the fruit of the unfair labor practices of the employers; that they were "simply a device to consummate and perpetuate" the companies' illegal conduct and constituted its culmination. But, as we have said, this conclusion is entirely too broad to be sustained. If the Board intended to make that charge, it should have amended its complaint accordingly, given notice to the Brotherhood, and introduced proof to sustain the charge. Instead it is left as a matter of mere conjecture to what extent membership in the Brotherhood was induced by any illegal conduct on the part of the employers. The Brotherhood was entitled to form its locals and their organization was not assailed. The Brotherhood and its locals were entitled to solicit members and the employees were entitled to join. These rights cannot be brushed aside as immaterial for they are of the very essence of the rights which the Labor Relations Act was passed to protect and the Board could not ignore or override them in professing to effectuate the policies of the Act. To say that of the 30,000 who did join there were not those who joined voluntarily or that the Brotherhood did not have members whom it could properly represent in making these contracts would be to indulge an extravagant and unwarranted assumption. The employers' practices, which were complained of, could be stopped without imperiling the interests of those who for all that appears had exercised freely their right of choice.

We conclude that the Board was without authority to require the petitioning companies to desist from giving effect to the Brotherhood contracts, as provided in subdivision (f) of paragraph one of the Board's order.

Subdivision (g) of that paragraph, requiring the com-. panies to cease recognizing the Brotherhood "as the exclusive representative of their employees" stands on a different footing. The contracts do not claim for the Brotherhood exclusive representation of the companies' employees but only representation of those who are its members, and the continued operation of the contracts is necessarily subject to the provision of the law by which representatives of the employees for the purpose of collective bargaining can be ascertained in case any question of "representation" should arise. § 9.[13] We construe subdivision (g) as having no more effect than to provide that there shall be no interference with an exclusive bargaining agency if one other than the Brotherhood should be established in accordance with the provisions of the Act. So construed, that subdivision merely applies existing law.

The provision of paragraph two of the order as to posting notices should be modified so as to exclude any requirement to post a notice that the existing Brotherhood contracts have been abrogated.

The decree of the Circuit Court of Appeals is modified so as to hold unenforceable the provision of subdivision (f) of paragraph one of the order and the application to that provision of paragraph two subdivision (c), and as so modified the decree enforcing the order of the Board is affirmed.

*Modified and affirmed.*

Opinion of MR. JUSTICE BUTLER.

I agree with the Court's decision that the Board was without authority to require employers to cease and desist from giving effect to the contracts referred to in

---

[13] 29 U. S. C. 159.

subdivision (f) of the first paragraph of the order. And I am of opinion that the entire order should be set aside.

The Board was without jurisdiction. The facts on which it assumed to exert power need not be narrated; they are sufficiently stated by the lower court and in the opinion here. Both courts rightly treat the case as one where neither employers nor employees are engaged in interstate or foreign commerce. Here, the employers are engaged solely in intrastate activities. A very small percentage of the products, furnished in that State to others, is by the latter used in interstate commerce. This Court has held that Congress cannot regulate relations between employers and employees engaged exclusively in intrastate activities.

In *Schechter Corp.* v. *United States* (May, 1935), 295 U. S. 495, decided shortly before passage of the National Labor Relations Act, we held that the federal government cannot regulate the wages and hours of labor of persons employed in the internal commerce of the State.

In *Carter* v. *Carter Coal Co.* (May, 1936), 298 U. S. 238, decided shortly after passage of the National Labor Relations Act, we held that provisions of the Bituminous Coal Conservation Act of 1935 looking to the control of wages, hours, and working conditions of persons engaged in producing coal about to move in interstate commerce and seeking to guarantee their right of collective bargaining, were beyond the power of Congress, for the reasons that it has no general power of regulation to promote the general welfare; that the power to regulate commerce does not include the power to control the conditions in which coal is produced; that the effect upon interstate commerce of labor conditions involved in the production of coal, including disputes and strikes over wages and working conditions, is indirect.

In the period, less than a year, intervening between the *Carter* case and *Labor Board* v. *Jones & Laughlin* (April, 1937), 301 U. S. 1, and other Labor Board cases

decided on the same day,[1]—and, as I think, wrongly decided—it was, on the authority of the *Schechter* and *Carter* cases, held by four circuit courts of appeals and six district courts that the power of Congress does not extend to regulations between employers and their employees engaged in local production. Their decisions are cited in the dissenting opinion in the *Labor Board* cases. 301 U. S. 76. In that period the lower courts were bound by our decisions to condemn the National Labor Relations Act, construed to apply to production or intrastate commerce, as not within the power of Congress.

This case is not distinguishable from the *Schechter* case or the *Carter* case. There, as here, the activities of the employers and their employees were exclusively local. It differs from the *Jones & Laughlin* case and all the other Labor Board cases.[2] In each of them, the employer was to an extent engaged in interstate commerce. The opinion just announced points to no distinction between this case and the *Schechter* or *Carter* case. Nor does it refer to the Labor Board cases as controlling here. But, to support this federal advance into local fields, the Court brings forward three railroad rate cases: *Houston & Texas Ry.* v. *United States (The Shreveport Case)*, 234 U. S. 342; *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563; and *New York* v. *United States*, 257 U. S. 591.

These cases give no support to the idea that, in absence of conflict between state and federal policy or regula-

---

[1] *Labor Board* v. *Fruehauf Co.*, 301 U. S. 49. *Labor Board* v. *Clothing Co.*, 301 U. S. 58. *Associated Press* v. *Labor Board*, 301 U. S. 103. *Washington Coach Co.* v. *Labor Board*, 301 U. S. 142.

[2] *Labor Board* v. *Fruehauf Co.*, 301 U. S. 49. *Labor Board* v. *Clothing Co.*, 301 U. S. 58. *Associated Press* v. *Labor Board*, 301 U. S. 103. *Washington Coach Co.* v. *Labor Board*, 301 U. S. 142. *Labor Board* v. *Greyhound Lines*, 303 U. S. 261. *Labor Board* v. *Pacific Lines*, 303 U. S. 272. *Santa Cruz Co.* v. *Labor Board*, 303 U. S. 453. *Labor Board* v. *Mackay Radio & T. Co.*, 304 U. S. 333.

tion, Congress has power to control labor conditions in production or intrastate transportation. In each, the federal interference is shown necessary in order to protect national authority, interstate commerce, and interstate rates established under federal law. Brief reference to the conditions that led up to these cases and the substance of the decisions will be sufficient to show they have no application here.

In 1906 and 1907, Minnesota reduced intrastate rates substantially below lawfully established interstate rates. Suits were brought by their stockholders to restrain the carriers from obeying, and state officers from enforcing, the local rates on the ground, *inter alia,* that they were repugnant to the commerce clause and that enforcement would necessarily interfere with and burden interstate transportation by the carriers. The *Minnesota Rate Cases,* 230 U. S. 352. The controversy was everywhere regarded as important. See p. 395. The facts found by the special master and adopted by the circuit court are stated in its opinion (*Shepard* v. *Northern Pacific Ry. Co.* (1911), 184 F. 765, 775–794) and summarized in the opinion of this Court. pp. 381–395. They show that the intrastate rates discriminated against interstate commerce and made it impossible for the carriers to collect, or for the United States to enforce, valid higher interstate rates. The trial court held the state measures repugnant to the commerce clause and upon that ground, among others, enjoined enforcement of the rates they prescribed.

The cases were argued here in April, 1912, and decided June 9, 1913. This Court upheld the state rates, notwithstanding the commerce clause, the Act to Regulate Commerce, the interstate rates lawfully established in accordance with federal law, and the destructive discrimination. It held that, in the absence of a finding by the Interstate Commerce Commission of unjust dis-

crimination, the intrastate rates were valid. The opinion reserved, p. 419, the question whether the Commission was empowered to make the determination. And that question was decided in the *Shreveport* case, 234 U. S. 342, 357.

That case was pending here before the decision in the *Minnesota Rate Cases,* and was decided in June, 1914. The Interstate Commerce Commission had found that rates prescribed by Texas operated to discriminate against interstate traffic from Shreveport, Louisiana, into Texas moving on lawfully established interstate rates. In order to eliminate the discrimination, the Commission directed the carriers to cease charging higher rates for interstate transportation than those charged for transportation between Texas points. This Court held the carriers free to raise the intrastate rates so as to remove the discrimination.

*Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.* (1922), 257 U. S. 563, upheld § 15a of the Interstate Commerce Act, added by § 422, Transportation Act, 1920, which empowered the Interstate Commerce Commission to remove discrimination resulting from intrastate rates unduly low, as compared with corresponding rates fixed under that section.

*New York* v. *United States,* 257 U. S. 591, held that intrastate rates so low that they discriminated against interstate commerce within the meaning of the Transportation Act, 1920, may constitutionally be increased under that Act by the Commission to conform with like rates in interstate commerce fixed by it.

The constitutional questions decided in these three cases were essentially different from the one of federal power here presented. The state measures there overborne were repugnant to existing federal regulations of interstate commerce. Application of the lower state rates made it impossible for federal authority to require, or to enable,

carriers to collect interstate rates lawfully established as just and reasonable. The policy and provisions of the New York State Labor Relations Act are in substance precisely the same as the national policy and the National Labor Relations Act. The State's interest, purpose, and ability to safeguard against possible interruption of production and service by labor disputes are not less than those of the federal government. The State's need of continuous service is immediate, while the effect of interruption on interstate or foreign commerce would be mediate, indirect, and relatively remote. The record fails to disclose any condition, existing or threatened, to suggest as necessary federal action to protect interstate commerce, or any other interest of the government against interruption or interference liable to result from controversies between these employers and their employees. The right of the States, consistently with national policy and law, freely to exert the powers safeguarded to them by the Federal Constitution is essential to the preservation of this government. *United States* v. *E. C. Knight Co.,* 156 U. S. 1, 12, 13. *Kidd* v. *Pearson,* 128 U. S. 1, 21. Asseveration of need to uphold our dual form of government and the safeguards set for protection of the States and the liberties of the people against unauthorized exertion of federal power, does not assure adherence to, or conceal failure to discharge, duty to support the Constitution. See *Schechter Corp.* v. *United States, supra,* 548–550. Cf. *Labor Board* v. *Jones & Laughlin, supra,* 29–30.

MR. JUSTICE MCREYNOLDS concurs in this opinion.

MR. JUSTICE REED concurring in part, dissenting in part.

While concurring in general with the conclusions of the Court in this case, I find myself in disagreement with the conclusion that the National Labor Relations Board was "without authority to require the petitioning companies

to desist from giving effect to the Brotherhood contracts, as provided in subdivision (f) of paragraph one of the Board's order." In that paragraph the petitioner companies are ordered to:

"I. Cease and desist from:

. . . . .

(f) Giving effect to their contracts with the International Brotherhood of Electrical Workers."

It is agreed that the "fundamental purpose of the Act is to protect interstate and foreign commerce from interruptions and obstructions caused by industrial strife." This is to be accomplished by contracts with labor organizations, reached through collective bargaining. The labor organizations in turn are to be created through the self-organization of workers, free from interference, restraint or coercion of the employer.[1] The forbidden interference is an unfair labor practice, which the Board, exclusively, is empowered to prevent by such negative and affirmative action as will effectuate the policies of the act.[2] To interpret the Act to mean that the Board is without power to nullify advantages obtained by the Edison companies through contracts with unions, partly developed by the unlawful interference of the Edison companies with self-organization, is to withdraw from the Board the specific authority granted by the Act to take affirmative action to protect the workers' right of self-organization, the basic privilege guaranteed by the Act. Freedom from employer domination flows from freedom in self-organization.

It is assumed that the terms of these contracts in all respects are consistent with the requirements of the National Labor Relations Act and are in themselves, considered apart from the actions of the Edison companies in securing their execution, advantageous in preserving industrial harmony.

[1] *Labor Board Cases,* 301 U. S. 1.
[2] §§ 7, 8, 10, Act of July 5, 1935, 49 Stat. 452–55.

The Board found that the Consolidated Edison Company and its affiliates, the respondents before the Board, "deliberately embarked upon an unlawful course of conduct, as described above, which enabled them to impose the I. B. E. W. upon their employees as their bargaining representative and at the same time discourage and weaken the United which they opposed. From the outset the respondents contemplated the execution of contracts with the I. B. E. W. locals which would consummate and perpetuate their plainly illegal course of conduct in interfering with, restraining, and coercing their employees in the exercise of the rights guaranteed to them under section 7 of the Act. It is clear that the granting of the contracts to the I. B. E. W. by the respondents was a part of the respondents' unlawful course of conduct and as such constituted an interference with the rights of their employees to self-organization. The contracts were executed under such circumstances that they are invalid, notwithstanding that they are in express terms applicable only to members of the I. B. E. W. locals. If the contracts are susceptible of the construction placed upon them by the respondents, namely, that they were exclusive collective bargaining agreements, then, *a fortiori,* they are invalid." [3]

The evidence upon which this finding is based is summarized in detail in 4 N. L. R. B., pages 83 to 94. It shows a consistent effort on the part of the officers and foremen of the Edison Company and its affiliates, as well as other employees of the Edison companies—formerly officers in the recently disestablished "Employees' Representation Plans," actually company unions—to further the development of the I. B. E. W. unions by recognition, contracts for bargaining, openly expressed approval,

[3] 4 N. L. R. B. 71, 94.

establishment of locals, and by permitting solicitation of employees on the time and premises of the Edison companies. By the Wagner Act employees have "the right to self-organization." It is an "unfair labor practice for an employer" to "interfere with, restrain or coerce employees" in the exercise of that right.[4] The Board concluded that the contracts with the I. B. E. W. unions were a part of a systematic violation by the Edison companies of the workers' right to self-organization.

This determination set in motion the authority of the Board to issue an order to cease and desist from the unfair labor practice and to take "such affirmative action . . . as will effectuate the policies of this Act." The evidence was clearly sufficient to support the conclusion of the Board that the Edison companies entered into the contracts as an integral part of a plan for coercion of and interference with the self-organization of their employees. This justified the Board's prohibition against giving effect to the contracts. The "affirmative action" must be connected with the unfair practices but there could be no question as to the materiality of the contracts. As this Court, only recently, said, as to the purpose of the Congress in enacting this Act:

"It had before it the *Railway Clerks* case which had emphasized the importance of union recognition in securing collective bargaining, Report of the Senate Committee on Education and Labor, S. Rep. 573, 74th Cong., 1st Sess., p. 17, and there were then available data showing that once an employer has conferred recognition on a particular organization it has a marked advantage over any other in securing the adherence of employees, and hence in preventing the recognition of any other." [5]

To this, it is answered that the extent of the coercion is left to "mere conjecture"; that it would be an "extrava-

[4] §§ 7 and 8, Act of July 5, 1935, 49 Stat. 452.

[5] *Labor Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, 267.

gant" assumption to say that none of the 30,000 members "joined voluntarily"; and that the "employers' practices, which were complained of, could be stopped without imperiling the interests of those who for all that appears had exercised freely their right of choice." [6] On the question whether or not the Edison companies' activities as to these contracts were a part of a definite plan to interfere with the right of self-organization, these answers are immaterial. It is suggested that the problem of the contracts should be approached with three cardinal considerations in mind: (1) that one contracting party is an "independently established" labor organization, free of domination by the employer; (2) that the contracts grant valuable collective bargaining rights; and (3) that they contain provisions for desirable working privileges. Such considerations should affect discretion in shaping the proper remedy. They are negligible in determining the power of the Board. They would, if given weight, permit paternalism to be substituted for self-organization. The findings of the Board, based on substantial evidence, are conclusive.[7] There was evidence of coercion and interference, and the Board did determine that the policies of the Act would be effectuated by requiring the companies to cease giving effect to these contracts.

The petitioners, however, aside from the merits, raise procedural objections. It is contended that before the Board could have authority to order the Edison companies to cease and desist from giving effect to their contracts with the unions, it was necessary that the unions as well as the Edison companies should have legal notice or should appear; that the unions were indispensable parties. This Court has held to the contrary in *Labor Board* v. *Pennsylvania Greyhound Lines*, 303 U. S. 261.

---

[6] *Ante*, p. 238.

[7] *Washington, V. & M. Coach Co.* v. *Labor Board*, 301 U. S. 142, 146.

This case determined that where an employer has created and fostered a labor organization of employees, thus interfering with their right to self-organization, the employer can be required without notice to the organization, to withdraw all recognition of such organization as the representative of its employees. It is said that this case "is not apposite, as there no question of contract between employer and employee was involved. The Board had found upon evidence that the employer had created and fostered the labor organization in question and dominated its administration in violation of § 8 (2)." [8] In the instant case it was found that no such domination existed. In the *Greyhound* case, the Board found not only domination under § 8 (2) but also, as in this case, an unfair labor practice under § 8 (1). The company's violation of § 8 (1) was predicated on its interference with self-organization.[9] In the *Greyhound* case it was said that the organization was not entitled to notice and hearing because "the order did not run against the Association." [10] Here the unions are affected by the action on the contracts, exactly as the labor organization in the *Greyhound* case was affected by the order to withdraw recognition. It would seem immaterial whether those contracts were violative of one or both or all the prohibited unfair labor practices.

A further procedural objection is found in the failure of the complaint, or any of its amendments, to seek specifically a cease and desist order against continued operation under the contracts. The companies were charged with allowing organization meetings on the company time and on company property, permitting solici-

---

[8] *Ante*, p. 233.

[9] *Labor Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, 263.

[10] *Id.,* 271.

tation of membership during company time, and paying overtime allowances to those engaged in soliciting or coercing workers to join the contracting unions. The complaint said that similar aid was not extended to a competing union and that office assistance was given to the effort to get members for the contracting unions. These charges made it obvious that the contracts were obtained from the unions which were improperly aided by the Edison companies in violation of the prohibitions against interference with self-organization. Contracts so obtained were necessarily at issue in an examination of the acts in question.

Certainly the Edison companies and the contracting unions could have been allowed on a proper showing a further hearing on the question of the companies' continuing recognition of the contracts. By § 10(f) the Edison companies and the unions could obtain a review of the Board's order. In that hearing either or both could show to the court, § 10(e), that additional evidence as to the contracts was material and that it had not been presented because the aggrieved parties had not understood that the contracts were subject to a cease and desist order, or had not known of the proceeding. The court could order the Board to take the additional evidence. This simple practice was not followed. Although all parties were before the lower court on the review, the petitioners chose to rely on the impotency of the Board to enter an order affecting the contracts.

In these circumstances the provision of the order requiring the Edison companies to cease from giving effect to their contracts with the contracting unions is proper. This order prevents the Edison companies from reaping an advantage from those acts of interference found illegal by the Board.

MR. JUSTICE BLACK concurs in this opinion.