**The UNITED STATES, Appellant,**

v.

**SODERHAMN MACHINE MANUFAC-
TURING COMPANY, Appellee.**

**Customs Appeal No. 5312.**

United States Court of Customs
and Patent Appeals.

Aug. 14, 1969.

Neese, J., dissented in part.

Edwin L. Weisl, Jr., Asst. Atty. Gen.,
Andrew P. Vance, Chief, Customs Sec-
tion, Glenn E. Harris, New York City,
for the United States.

Sharretts, Paley, Carter & Blauvelt,
New York City, for appellee. M. Barry
Levy, New York City, of counsel.

Before RICH, Acting Chief Judge,
NEESE, Judge, sitting by designation,
and ALMOND and BALDWIN, Judges.

RICH, Acting Chief Judge.

This appeal is by the Government
from the judgment of the Customs
Court, Second Division, 59 Cust.Ct. 547,
C.D. 3225, sustaining the importer's pro-
tests against the collector's classification
of certain imported chippers, chip-
screens, and parts.

The nature of the merchandise in-
volved will appear more fully hereinaf-
ter. As introduction, it appears that
chippers are machines used to reduce
wood to chips and that chipscreens are
machines used to grade the wood chips
according to size. The Collector of Cus-
toms at Jacksonville, Florida, had classi-
fied the chippers and chipper parts as
"other machine tools" under Item 674.-
42, Tariff Schedules of the United
States (TSUS), or parts thereof under
Item 674.53 TSUS. The collector had
classified chipscreen parts under Item
678.50 TSUS as parts of machines not
specially provided for (except one
chipscreen center, which, at the trial, de-
fendant contended should properly have
been classified under Item 678.50
TSUS). Appellee protested the classifi-
cation, maintaining that the foregoing
merchandise was properly classifiable
under Item 668.00, as "machines for
making cellulosic pulp, paper, or paper-
board" and under Item 668.06 TSUS for
parts of such machines, and the Customs
Court sustained the protest.

## PERTINENT TARIFF SCHEDULES

The pertinent items of the tariff schedules are:

Machine tools:

Metal-working machine tools:

\* \* \* \* \* \* \* \*

Other machine tools:

\* \* \* \* \* \* \* \*

674.42   Other ..............................10% ad val.

Work and tool holders and other parts of, and accessories used principally with, machine tools; tool holders for the mechanical hand tools provided for in items 651.27, 674.70 and 683.20:

\* \* \* \* \* \* \* \*

Other:

Parts:

\* \* \* \* \* \* \* \*

Other:

\* \* \* \* \* \* \* \*

674.53      Other parts .....................14% ad val.

\* \* \* \* \* \* \* \*

678.50   Machines not specially provided for, and parts thereof ...............................10% ad val.

Machines for making cellulosic pulp, paper, or paperboard; machines for processing or finishing pulp, paper or paperboard, or making them up into articles:

668.00   Machines for making cellulosic pulp, paper or paperboard .............................7% ad val.

\* \* \* \* \* \* \* \*

Parts of the foregoing machines:

\* \* \* \* \* \* \* \*

Other:

668.06     Parts of machines for making cellulosic pulp, paper or paperboard ....7% ad val.

———◆———

## TESTIMONY AT TRIAL

Each party produced one witness at the trial. Testifying for the appellee, Mr. W. Maynard Gaitten, an industrial designer who was chief engineer of the appellee corporation and who had helped to design and install the merchandise in issue, confirmed that the chippers are used "[j]ust to make pulp chips" and have no other secondary uses or functions. According to Mr. Gaitten, wood is first converted to a suitable pulp chip, which is then screened and fed to a digester, where it is converted by chemical and heat action into a usable pulp. The chipscreen, he said, is an "intermediate machine, to help make more uniform and to make a more desirable pulp chip." Mr. Gaitten said that chips made by the imported chippers have no function other than use in the manufacture of pulp; and he further stated that the

involved parts of chippers have no function or use other than with such chippers. He testified that none of the items in issue, except for the two horizontal chippers in Invoice 27576 (Protest No. 65/8822), could be used independently, by themselves, but that the above chippers were sufficiently completed to be so used.

The Government's witness, Mr. Ernest C. Pundt, controller for Fulgham Industries, Inc., of Wadley, Georgia, formerly vice president of Carl W. Mullis Engineering & Manufacturing Company of Lancaster, Pennsylvania, testified that Fulghum Industries made a chipper similar in appearance and function to the Soderhamn chipper with which he was familiar. Mr. Pundt's testimony appears to have been mainly of interest insofar as he indicated that wood chips may have uses other than pulp production. In this he testified:

Q. What other uses are the chips put to?

A. The wood chips are used in some instances to be processed into charcoal. Charcoal would be used eventually for outdoor cooking. Wood chips that are produced out of hickory are packed and used in stores, to be used for outdoor cooking purposes. Wood chips are used in the manufacture of Masonite board, that is, and other types of wall paneling. Wood chips are used in the manufacture of — to be with rubberoid materials for roofing purposes. They are also used for bedding for livestock and for litter on chicken farms.

As to the relative proportions in which wood chips are divided between paper making and other uses, Mr. Pundt's testimony was:

Q. And what percentage, in your opinion, and based on your experience of the chips are used in the production of pulp and paper?

A. You mean over the whole United States?

Q. Well, if you know that answer yes.

A. I don't know it all over the United States.

Q. Limiting the answer to your own personal experience.

A. Probably 90 per cent.

THE CUSTOMS COURT DECISION

The Customs Court found the chippers to fall within Items 668.00 and 668.06, stating:

The record clearly establishes that the involved chippers produce a product, chips, which is used by the paper industry to manufacture pulp. While the record does indicate that sometimes chips are used to fire boilers, even the witness on behalf of defendant admitted that probably 90 percent of the chips are used in the production of pulp. This, in our opinion, is sufficient to establish that said chippers are chiefly used for making pulp and fall within the purview of item 668.00 and item 668.06 if the chippers are in truth and in fact machines.

That chippers were machines was decided by the Customs Court after consideration of the case of Bird Machine Company v. United States, 51 CCPA 42, C.A.D. 835 (1964), as well as a definition from the Dictionary of Paper, published under the auspices and direction of the American Paper and Pulp Association, New York, N. Y. Drawing support from Bird for the position that a chipper came within the ambit of the item relating to machines for making paper and pulp, the court stated:

In the case of Bird Machine Company v. United States, 51 CCPA 42, C.A.D. 835, and in particular the portion of the decision involving the "Skardal stock preparator", the court found said machine to fall within the purview of the predecessor provision contained in paragraph 372, Tariff Act of 1930, as modified. The Court of Appeals, in approving the dissenting opinion of the Customs Court, quoted the following:

* * * Chippers, grinders, refiners, and beaters are stock treating

elements which are parts of the pulp making process. Yet, *they appear to have been the very machines* for making paper and pulp accorded separate tariff status by the new language, and hence, are not the stock treating parts provided for in paragraph 356. [Italic quoted.]

It would, therefore, appear that the predecessor provision of paragaraph 372, *supra,* was intended to embrace chippers.

The court then concluded, as to the chippers:

In view of the foregoing and based upon the dictionary definition and the uncontradicted testimony in the record, we are of the opinion that the chippers and parts listed in plaintiff's exhibit 1 are machines for producing a product, chips, which is chiefly used in making cellulosic pulp, and as such are properly classifiable within the *eo nomine* provisions therefor in item 668.00 or 668.06, TSUS, which provide for duty at the rate of 7 per centum ad valorem. * * *

As to the chipscreens, the court decided as follows:

The record further discloses that a chipscreen is one of the devices used in the process of making pulp. It is described as an "intermediate machine, to help make more uniform and to make a more desirable pulp chip," which under most conditions is essential to the manufacture of pulp chip. It is clear from the record that such screens are machines.

For the foregoing reasons, we hold the involved screens to be "machines for making cellulosic pulp, paper or paperboard" in item 668.00, TSUS. The claim of plaintiff that they should have been so classified and assessed

with duty at the rate of 7 per centum ad valorem is sustained.

Finally with regard to the parts, the court concluded:

We are of the opinion that the remaining merchandise covered by these protests and set forth in schedule 1 are parts of machines for making cellulosic pulp. The TSUS declares the classification of such merchandise without ambiguity. General Interpretative Rule 10 (ij) states as follows:

* * * a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

The record in the case at bar establishes that the remaining items have no other use than with the imported chipping machinery. The courts finds [sic] no specific provisions in TSUS for such merchandise. We, therefore, hold the remaining items listed in schedule 1 to be parts of machines and properly classifiable as "Parts of machines for making cellulosic pulp, paper or paperboard" within the purview of item 668.06, and subject to duty at the rate of 7 per centum ad valorem, as claimed by plaintiff.

OPINION

Appellant's chief contention is that the Customs Court erred in misapplying the *Bird* decision to support the classification of the chippers within the provision for a machine for making paper or pulp, and should instead have looked to the decision of this court in Border Brokerage Co. v. United States, 48 CCPA 113, C.A.D. 774 (1961). In *Border Brokerage* the merchandise involved was transfer chairs, chains, and relay valves to be used on mechanical whole log debarkers.[1] Appellant draws our atten-

---

1. The function of these parts is described in the *Border Brokerage* opinion as follows:

The chairs, chains and valves are used on mechanical whole log debarkers which are sold to "some pulp mills and mostly saw mills." The function of the chairs and chains is to help direct the logs and carry them through the machine, while the valves serve to regulate

tion to the following language from that opinion:

> In our opinion the record supports the finding that the chief use of the instant debarkers is in the lumber industry where they serve to convert the waste pieces which are removed in squaring the logs into a by-product which may be sold to pulp mills. We agree with the Customs Court that such use is too remote to permit classification of the debarkers as pulp making machinery. * * *

From that extract appellant draws the following conclusion:

> In regard to such machines as debarkers, therefore, this Court emphasized the *situs* of their chief use and the character of the resultant product as a *material* which, may be sold to pulp mills. * * *

Appellant then argues that there is nothing in the record here to establish that chippers or chipscreens are chiefly used in the pulp or paper mills, so that, following *Border Brokerage*, the instant machinery cannot be classified within the provision for machines for making pulp.

Our reading of *Border Brokerage*, however, is that the extract from it quoted by appellant does not necessarily lead to the conclusion appellant draws, that the ratio decidendi of *Border Brokerage* was that situs of chief use controls. Indeed, the *Border Brokerage* opinion makes clear that other important considerations that affected our decision were that the record failed to establish that the particular valves, chairs, and chains were used exclusively, or even chiefly, in whole log debarking machines. Moreover, although it appears that it may have been shown that the chief use of the debarkers was to convert waste pieces from logs into a by-product which could be sold to paper

mills, it did not appear in *Border Brokerage* that the *chief use of the by-products* was sale to paper mills. By contrast, it is quite clearly established by the record in the present appeal that the chief use of the wood chips is in paper making.

More persuasive as precedent than appellant's interpretation of *Border Brokerage* is our decision in *Bird,* relied upon by the Customs Court. In that case we were considering the classification of Skardal stock preparator and certain parts thereof. There we directed attention to the portion of paragraph 372 of the Tariff Act, as modified, which provided for "machines for making paper or paper pulp," the forerunner of Items 668.00 and 686.06 involved here. It was observed that this provision in paragraph 372 was adopted pursuant to a United States-Swedish Trade Agreement and we referred to the relevant legislative history as set forth in the "Digest of Trade Data with Respect to Products on which Concessions were Granted by the United States in the United States-Swedish Trade Agreement," a document published by the Tariff Commission in July, 1935, following modification of paragraph 372 in 1935. 68 Treas.Dec. 19, T.D. 47785. Pertinent parts of that digest read:

> The above classification [in paragraph 372] is intended to include machines used (1) in the preparation of wood, rags, and other fibrous material for conversion into pulp, (2) in conversion of the prepared material into pulp, (3) in *refining* or packaging such pulp *preliminary* to its use in making paper, and (4) in the manufacture of such pulp into paper. The classification does not include sawmill machines such as slashers, log conveyors, etc., and other machines which though used in pulp mills have a more

the pressure applied in debarking the logs. The logs are debarked in lumber mills so that the waste pieces which are removed from the logs, when they are squared into boards, may be sold to

pulp mills for use in making paper pulp. If the waste pieces are not intended for such use the bark is not removed.

general use in the lumber and wood-using industries. [Emphasis ours.]

We then stated our agreement with the analysis of the case law and statute made by the dissenting judge in the Customs Court which we quoted as follows:

The foregoing statement [from the legislative history] lends support to the proof adduced by plaintiff, if indeed it be beyond the purview of this court to judicially notice the fact, that the manufacture of paper pulp is the combined contribution of a large number and considerable variety of individual machines. Some prepare the initial materials, others process and treat stock, still others convert pulp into finished paper. Consequently, when the provision for machines for making paper and pulp was written into the trade agreement, it must have been its purpose to embrace *more than just a single machine* for making paper pulp and a single machine for making paper. If then, the intent of the negotiators of this provision was to include several different kinds of machines which, together, produce paper pulp, the major premise of the defendant's position is seemingly undermined. Chippers, grinders, refiners, and beaters are stock treating elements which are parts of the pulp making process. Yet, *they appear to have been the very machines* for making paper and pulp accorded separate tariff status by the new language and, hence, are not the stock treating parts provided for in paragraph 356.

That rationale, adopted by this court, makes it clear that the consideration which determined whether machinery fell within paragraph 372, was by *function*, without any mention of situs of use. Thus, in the present instance the Customs Court was quite correct in classifying the chippers according to their function, as determined by their chief use of record, of providing chips for pulp making. Moreover, we see no reason to accord a different treatment to the chipscreens from that accorded the chippers, and no such differentiation is urged by appellant.

■ As to the parts, the record establishes that they have no use other than with the imported chippers and chipscreens. We therefore conclude that the Customs Court was correct in holding the parts [2] to be properly classifiable as "Parts of machines for making cellulosic pulp, paper or paperboard" under Item 668.06.

For the foregoing reasons, the judgment of the Customs Court is *affirmed.*

Affirmed.

NEESE, Judge (concurring in part and dissenting in part):

Multiple uses of the imported articles here at issue were shown by the proof. It was, therefore, incumbent upon the appellee to have established by the evidence that the chief use of each machine was that contemplated by the classification asserted. United States v. C. S. Emery & Co., 53 CCPA 1, 8 [2], C.A.D. 868 (1966).

The Customs Court apparently reasoned that, as the chief use of the wood chipper machines is for making cellulosic pulp and the chipscreen machines are used only with the woodchippers, the chief use of the chipscreen machines is also for making cellulosic pulp. This may be true, but there is not sufficient substantial evidence in the record before us to have proved it.

Our function is, not to classify the machines at issue, but to review the evidence supporting the classification. Stripped of the conclusionary evidence in the record that under "most conditions" a chipscreen is essential to the manufacture of pulp chip, I find nowhere in the record any evidence from which the court below could have found, directly or by reasonable inference, that the chief use of the chipscreens, parts

---

2. Including the center for chipscreen 750–35A entered under entry T–3788 covered by protest 65/8825.

for which are here at issue, is for making cellulosic pulp. There is no evidence as to what happens to woodchips upon screening which are too large for use in making pulp chip, as to how much of the screened wood chips is required by paper manufacturers to be screened, as to what conditions must exist before a chipscreen is essential to the manufacture of pulp chip, or as to what proportion the production of industrial pulp bears to the paper manufacturing industry as a whole.

If this trial had been to a jury burdened with the responsibility to draw a conclusion of fact as to the chief use of these chipscreen machines, there is not enough evidence in the record to have justified a refusal to direct a verdict for the appellant on this issue. National Labor Relations Board v. Columbian E. & S. Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660, 665 (1939), citing Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217 [19], 83 L. Ed. 126, 140 (1939). Thus, the judgment of the Customs Court should have been reversed as to the parts for the chipscreen machines.

I concur with the majority insofar as the judgment of the Customs Court is affirmed with regard to the classification of the woodchippers and parts thereof.