## NATIONAL LABOR RELATIONS BOARD
v.
## POLYNESIAN ARTS, Inc.
### No. 11827.

United States Court of Appeals
Sixth Circuit.
Jan. 14, 1954.

Jean Engstrom, Washington, D. C., George J. Bott, David P. Findling, A. Norman Somers, Frederick U. Reel, Jean Engstrom, Washington, D. C., on brief, for petitioner.

Garland R. Hubbard, Louisville, Ky., Roy A. Roberts, Mayfield, Ky., Richard F. Moll, St. Louis, Mo., on brief, for respondent.

Before ALLEN, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

The National Labor Relations Board filed petition for enforcement of its order against respondent, Polynesian Arts, Inc., of Mayfield, Kentucky, on findings that respondent had violated Section 8(a) (2) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1, 2), by dominating, interfering with the formation of, and contributing support to, the National Brotherhood of Operative Potters, Local No. 227, AFL, and had also violated Section 8(a) (3) and (1) of the Act by discharging two employees because of their activity on behalf of a rival union, the United Packinghouse Workers of America, CIO. The Board further found that respondent had violated Section 8(a) (1) of the Act by engaging in surveillance of a CIO meeting. The Board's order required the respondent to cease and desist from such dominance, interference, and recognition of the AFL union, as well as sur-

veillance of its employees; discouraging membership in the CIO union, or any other labor organization of its employees, by discrimination in discharge or hiring; and in any other manner interfering with the exercise of the right of its employees to self-organization. The Board ordered respondent to withdraw and withhold all recognition from the AFL union and to offer Dorothy Webber and Vivian Montgomery immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges, and make each of them whole for any loss of pay they may have suffered by reason of the discrimination against them.

On the question of interference and domination, it appears that Mr. Gantt, the President of the company, either had no conception of the right of employees to organization without his interference, or no regard for it. He had himself built up this small, successful business, and was as paternalistic about it as it was possible to be. First, he opposed all unions; then, he strongly favored the AFL; subsequently, he fought the CIO. There was evidence that he seemed to take it as an affront if an employee favored a union when he did not, or if an employee did not favor a union if he did. Everything he did was in the open, and done with what he considered benevolence toward his employees, but what really amounted to misguided illegal domination.

The evidence shows that when the AFL union representatives came to the plant on March 7, 1951, Mr. Gantt called a meeting of all the employees and made a speech before them in which he introduced the AFL organizers and told the employees that he thought it was time they had a union for their protection and benefit. He stated that he was going to let the union organizers explain the matter to them and that "whatever they said it was all right for (the employees) to cooperate with them." ˙ Subsequently, the AFL union organizers proposed a contract with the company, and a subsequent meeting of employees was called to consider the agreement. A vote was taken and the contract was rejected by the employees. Mr. Gantt was very much displeased with the results of the vote and remarked, in the words of an employee, that "he would like to see the sheep from the goats and the ones that was against him step out the door." This was such an absurd and illegal action on his part that the AFL organizers, whom he favored, spoke up and told him that he could not do that. Subsequently, the contract was revised and accepted by the employees.

At the time Mr. Gantt called the meeting of the employees and introduced the AFL organizers, application cards for membership in the AFL union were passed out to the employees. Shortly after the meeting and on the same day, Mrs. Gantt told Mrs. Montgomery that she and Mr. Gantt were for the AFL one hundred per cent and recommended that the employees sign the membership application cards. Mrs. Montgomery testified that she then told Mrs. Gantt she would like to leave the plant because she didn't feel well, and when Mrs. Gantt asked her if she had signed the card, she said she would see about it when she got back to the plant. However, Mrs. Montgomery, on leaving the plant, went directly to a pay station telephone, called a local CIO representative, and made arrangements for a CIO organization meeting to be held at her husband's inn the next day. When she returned to the plant, she was asked by Mr. Gantt whether she had signed the card and when she answered "No," he asked if she were going to sign it. She testified that she stated that she did not want to, and that she asked Mr. Gantt why he wanted them to have the union when he had fought the CIO so hard two years before. He replied that he didn't intend to have the CIO in the plant. Thereupon, Mrs. Montgomery signed the membership application card in the AFL, but she testified that she said to Mr. Gantt she did not know whether she would vote for the union. There is

evidence to support the Board's finding that in the union campaign, Mr. Gantt aided the AFL campaign, volunteered the use of company time for organization meetings, and, by implication, at least, threatened reprisal for refusal to sign membership cards.

■ Upon review, it clearly appears that substantial evidence on the record as a whole sustains the Board's findings of domination and interference by respondent, and surveillance of the CIO meeting. It further appears that the findings of the Board that Dorothy Webber was discharged because of activity on behalf of the rival union were also sustained by such substantial evidence, although the testimony was strongly disputed.

In spite of the foregoing conclusions, we are of the opinion that the finding that Vivian Montgomery had been discharged by respondent because of her activity in the CIO union was not sustained by the evidence on the record, viewed as a whole, but that such evidence discloses that she was discharged for insubordination, unrelated to activities on behalf of the CIO.

Mrs. Montgomery had been a personal friend of Mr. and Mrs. Gantt, who were the real owners of the respondent company. She called them by their first names, and referred to Mr. Gantt as "Pappy." She had previously taken care of the Gantt children, and in her testimony at the hearing, she stated that she had been, and was at that time, a very good friend of Mrs. Gantt; that her feelings had not changed toward Mrs. Gantt; and that she was still very fond of her. Two years before Mrs. Montgomery was discharged, the CIO was conducting its first, and unsuccessful, campaign to organize respondent's employees. Mrs. Montgomery testified that at that time she knew Mr. Gantt didn't approve of unions, or of the CIO, and she stated that she did not either; that Mr. Gantt was kind to all his employees and that she agreed with him with respect to the union; that she told her friends she would back him up by not voting for it; that she voluntarily got up in the plant and told the girls in the decorating department that she wanted them to know that she was not taking any part in the CIO and did not approve of it; and that she fought against it right up until the election day when it lost the election.

In the decorating department of the company, Mrs. Gantt, the wife of the President, had at first been in complete charge. However, as the corporation continued to expand, the department grew to a much larger size, and the company thereafter moved to enlarged quarters in its newly constructed building. Because of the fact that Mrs. Gantt and Mrs. Montgomery were very good friends, Mrs. Gantt said that she had "foolishly" allowed her certain privileges, which thereafter, eventually, resulted in what Mrs. Gantt called abusiveness on the part of Mrs. Montgomery. Mrs. Montgomery had, during her previous work with the Gantts, been a widow. She subsequently married a man who owned the Cardinal Inn, and after her marriage, the intimacy between Mrs. Gantt and Mrs. Montgomery became less, because of Mrs. Montgomery's new interests. Several months before the discharge of Mrs. Montgomery from employment, however, Eulalya Rogers, who had been working on a night shift, and whom Mrs. Gantt considered qualified to be a supervisor, was placed in complete charge of the decorating department. From then on, Mrs. Montgomery refused to take any instructions from the new supervisor, Mrs. Rogers. Instead, it became necessary for the personnel manager, Mr. Bell, to give her such instructions, although this was not one of his duties. When Mrs. Montgomery, on one occasion, informed Mr. Bell that she was leaving the plant and he asked her to inform her supervisor, Mrs. Rogers, according to regulations, Mrs. Montgomery replied: "to hell with it, you know how I feel about her." This was not disputed.

It appears that there was a Coca-Cola vending machine at the plant and that

employees were authorized to secure and drink the beverage during rest periods. A notice was placed on top of the time clock forbidding employees to use the vending machine during working hours. Mr. Gantt testified that Mrs. Montgomery persisted in going to the machine repeatedly and drinking Coca-Cola during working hours, and other employees then asked why they couldn't do the same thing if she was allowed to do so. Gantt told Mrs. Montgomery that he had warned her several times about breaking regulations in using the telephone in the department and drinking Coca-Cola during working hours, and told her that the next time she did it, he would dismiss her. He told her also that if she were ill and needed any medicine, all she had to do was to get the permission of her supervisor as the company kept medicine on hand for such occasions. Her answer to Mr. Gantt was that "she wanted to know what the God-damn hell I was going to do about it." This was not disputed. After warning her numerous times not to use the telephone during working hours, she persisted in doing so, and Mr. Gantt finally had that particular telephone removed.

On another occasion, Mr. Gantt asked Mrs. Montgomery to take the place of a girl who was absent, and to place the lamps "on the line." Although she had a guaranteed wage, she refused. Mr. Gantt told her that she was a "utility" girl and supposed to do anything in the decorating shop, and that she should do this requested work. In refusing to do the work, she yelled at him. As he said, "It isn't just what she said, it was how she yelled back at me; it was her attitude. * * * the way she yelled back at me when I asked her to take the girl's job."

Other causes of discord arose. Several girls in the shop went to Mr. Gantt at various times to protest against the way in which Mrs. Montgomery turned her radio up so loud that "it was nerve-racking." She had been requested on many occasions to turn her radio down by Mr. Gantt, and he told her to take

it home. She replied that she would keep it there if she wanted to. When Supervisor Rogers would ask her to turn it down, Mrs. Montgomery would laugh at her. Finally, Mr. Gantt told her that if she did not take it home, he would do it himself, and it was then removed.

There was much testimony that Mrs. Montgomery, instead of placing imperfect and rejected lamps in a box, would throw them into the box or against the wall with such force that they would make a loud, shattering noise. One of respondent's employees testified that she and many other girls working at the plant were obliged to call on Mr. Gantt in order to have the noise stopped so that they could work in peace. Mrs. Rogers testified that the noise resulting from such smashing of the lamps was enough to shatter one's nerves, and that no one else ever threw the lamps in this way. The foregoing is undisputed. Mrs. Gantt said that Mrs. Montgomery "was all over the department" on a great many occasions, stopping to talk to various employees during working hours, although employees were not allowed to do this; that many times, she asked her to return to her desk but that, instead, she would continue her conversation until she was finished and only then go back.

■■ Much of the foregoing conduct might be considered to consist of minor infractions of rules. But if it be found willful on the part of an employee and deliberately calculated to disrupt work, to foment discord, and to cause trouble between worker and supervisor, between employee and employer, and between employer and supervisor, such conduct justifies dismissal. In our opinion, the reliable, probative, and substantial evidence in this case does not support the findings on which the order of the Board was based requiring reinstatement of Mrs. Montgomery to her former employment with full pay from the time of her dismissal. Rather, the evidence sustains the conclusion that she was not wrongfully discharged, and such evidence appears from Mrs. Montgomery's own

admitted conduct and statements in a purportedly friendly letter written after her discharge, to Mrs. Gantt. In considering this evidence, one must compare it with Mrs. Montgomery's testimony with respect to Mrs. Rogers. She was asked:

"Q. Did you recognize Mrs. Rogers' authority as the supervisor in the decorating shop? A. In the decorating shop, I did.

"Q. Did you resent her in any fashion because she was your supervisor? A. I had absolutely no resentment towards her whatsoever in regard to the pottery work or her being a supervisor.

"Q. Were you jealous of her in any fashion? A. Absolutely not. I had no reason to be jealous of Mrs. Rogers.

\* \* \* \* \* \*

"Q. Mrs. Montgomery, isn't it a fact you disliked Mrs. Rogers and there was some agitation between you two? A. It is not a fact. I have absolutely no objection to Mrs. Rogers at all."

But following her discharge from employment, Mrs. Montgomery wrote to Mrs. Gantt, whom she addressed familiarly by her first name, a letter, the essential parts of which appear in the margin.[1]

[1] "Lita—it never ceases to amaze and sometimes amuse me—at the lies I constantly hear—That I have said about you all & that you all have said about me— and every time I can trace the origin back to Eula Rogers—It is really amazing how fast an evil mind can think up lies to try to further its own standing. \* \* \* Eula swore she would make you hate me & Irene both—She's doing a pretty good job—There's very few employees in the plant that wouldn't beat her to death—if they dared—They hate her with a vengeance—but smile & go on—for they see— she would cause all of them to get fired like she did me & Dorothy—She kept pappy shot so full of lies all the time about us—that she kept him a nervous wreck—she so wanted to be the important one—Evidently she succeeded—she was so smooth about it He believed her—It wasn't me and Dorothy stiring up trouble —She was running from one to the other —telling lies that we didn't say—She's still doing the girls that way—But it has only made the girls all closer together— for they realize now she's lieing on different ones—I had been working there 3 weeks when she warned me to 'Keep off her Territory'—meaning pappy—Three months later she said 'I guess you know you've got him now—but I had him first —and I'll have him again.' \* \* \* I can prove by Jeanette that she hung around out there when you were in N. Y. and the children were sick—She didn't know I was up stairs holding the children—Jeanette wanted to go down & beat hell out of her then—but I told her to forget it—That Mrs. Gantt wasn't dumb— all or any of the girls can tell you how she swore to get Irene & me out of the way—Then she would drive the Cadilac and show us who was who look's like she's succeeding—She made the boast that 'Lita would never suspect her to being in love with Hugh—as she was floor lady and had the right to have private conferences with him'—She brazenly speaks of 'Hugh & Lita'—when speaking of you to any one in the plant—Every one figures now that you are so afraid of pappy—is why you over look so much—They all know that Eula has given pappy orders to keep Irene out of his cars—Eula made her brag that 'Hugh would have to pay her enough that she could dress as nice and have as much as Lita'—I don't know what kind of a hold she has on pappy—but he sure let's her lead him around—I know—and Mr. Bell knows and a number of girls know that Eula deliberately put her hands on my luster lamps to mess them up to try to get me fired—More than one girl knows that Eula poured oil of murbane in Irene's luster to get her bawled out. \* \* \* Every luster girl in your plant lives in horror from one day to the other that she has mixed their luster—as they've seen her do it to me and Irene & others—Every one is afraid to tell it or admit it—as they all love their work— and know Eula will get them fired if they tell on her—Eula went out to Charlene & Va—for supper and tried to persuade Charlene to go to pappy & tell him it wasn't her laying out with Joe Helm— Joe & Jimmy Mills laugh about it—Joe says she is the dirtest lying woman he ever knew—Jimmy Mills said Joe wasn't the only man the cabs were taking out to meet her—Charlene said she was too fond of the Gantts to lie for Eula Rogers — \* \* \*. A crowd of people were telling about Floy having a heart attact because Eula finally took Jess away from

This letter completely reveals the depth of her animosity toward Mrs. Rogers. It destroys her sworn testimony on the hearing that she had no dislike for Mrs. Rogers and absolutely no objection to her in any way. Moreover, in spite of the assurances to Mrs. Gantt that she was always fond both of her and of Mr. Gantt, no one could fail to see that she was, in every way possible, trying to make Mrs. Gantt believe that Mrs. Rogers was destroying her home and family life; that she was stealing her husband from her because of some hold she had upon him; that, at the same time, she was associating in a degrading and generally promiscuous way with other men; that she was able to have various innocent girl employees discharged without cause because of her alleged hold over Mr. Gantt; and that Mrs. Rogers was ruining Mrs. Gantt's friendship with many people. It can be judged what havoc of business and personal relations was caused by such conduct in this small company in the town of Mayfield, of about 9,000 population. This letter makes it clear, beyond doubt, that at the time Mrs. Rogers was placed above her as supervisor, Mrs. Montgomery, as was unqualifiedly testified to by Mr. and Mrs. Gantt and Mrs. Rogers, became insubordinate, refused to take orders, disobeyed rules, and by her own conduct, justified her employer in discharging her; and it is notable that nowhere in her letter to Mrs. Gantt did Mrs. Montgomery mention or suggest any complaint that her discharge from employment resulted from any union activity, but only that it was caused by the influence that Mrs. Rogers had over Mr. Gantt; and she urged Mrs. Gantt not to give up a loving friend like herself because of the smooth lies which she said Mrs. Rogers told about her. The probative evidence showed that Mr. and Mrs. Gantt did not discharge her for union activity, and that she never thought they did. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; and the evidence on which the Board based its findings that Mrs. Montgomery was discharged because of union activity falls far short of this standard.

We are of the opinion that the findings of the Board upon which its order was based requiring her reinstatement for wrongful discharge were not supported by reliable, probative, and substantial evidence.

In all other respects, the findings of the Board are sustained by substantial evidence on the record as a whole, and an order will be entered for its enforcement.

Floy—Her neighbors say she almost had a nervous break down—That she shared Jess with Eula at her house—till Eula gave Jess to understand to leave her alone—now Eula is out to get Floy fired—if she has to change labels on boxes and mess her up like she did Lydia—There's no end to the dirty things she is doing to the employees—But worse of all she is destroying your home by degrees—by making her demands of pappy— * * *. No—I don't want to see her fired—for eventually the entire plant is going to rise up and beat the wholly dam hell out of her—if she stay's there long enough—and that is what will do me more good than anything on earth I can think of. * * *