Swanick v. SSA                    CV-99-293-M    07/25/00

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Thomas J. Swanick,
     Plaintiff

     v.                                    Civil No. 99-293-M
                                           Opinion No. 2000 DNH 164
Kenneth S. Apfel, Commissioner,
Social Security Administration,
     Defendant


# O R D E R


Claimant Thomas J. Swanick moves pursuant to 42 U.S.C.

§ 405(g) to reverse the Commissioner's decision denying his

application for Social Security Disability Insurance benefits

under Title II of the Social Security Act (the "Act"), 42 U.S.C.

§ 423, and Supplemental Security Income disability payments under

Title XVI of the Act, 42 U.S.C. § 1382.[1]  The Commissioner moves

for an order affirming the Commissioner's decision.  For the

_____

[1]The "standards for determination of disability and for
judicial review in cases under 42 U.S.C. § 423 and 42 U.S.C. §
1382c(a)(3) are identical;" therefore, the court will not
differentiate between Title II and Title XVI decisions when
citing cases in this order.  Donato v. Secretary of the Dep't of
Health and Human Servs., 721 F.2d 414, 418 n.3 (2d Cir. 1983).

reasons that follow, the decision of the Commissioner is affirmed.

Standard of Review

I.  Properly Supported Findings by the Administrative
    Law Judge ("ALJ") are Entitled to Deference.

Factual findings of the Commissioner are conclusive if supported by substantial evidence. See 42 U.S.C. §§ 405(g), 1383(c)(3); Irlanda Ortiz v. Secretary of Health and Human Services, 955 F.2d 765, 769 (1st Cir. 1991).[2] Moreover, provided the ALJ's findings are supported by substantial evidence, the court must sustain those findings even when there may be substantial evidence supporting the claimant's position. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (The court "must consider both evidence that supports and evidence

---

[2]Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). It is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620 (1966).

2

that detracts from the [Commissioner's] decision, but [the court] may not reverse merely because substantial evidence exists for the opposite decision."); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039-40 (9th Cir. 1995) (The court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.").

It is "the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Commissioner] not the courts." <u>Irlanda Ortiz</u>, 955 F.2d at 769 (citation omitted). Accordingly, the court will give deference to the ALJ's credibility determinations, particularly where those determinations are supported by specific findings. <u>See</u> <u>Frustaglia v. Secretary of Health & Human Services</u>, 829 F.2d 192, 195 (1st Cir. 1987).

II.  <u>The Parties' Respective Burdens</u>.

An individual is disabled for purposes of both Title II and Title XVI if he or she is unable "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve (12)] months." 42 U.S.C.A. §§ 423(d)(1)(A) (West Supp. 2000) & 1382c(a)(3)(A) (West Supp. 2000). When determining whether a claimant is disabled, the ALJ is required to conduct a five-step sequential analysis by making the following inquiries:

(1)  whether the claimant is engaged in substantial gainful activity;

(2)  whether the claimant has a severe impairment;

(3)  whether the impairment meets or equals a listed impairment;

(4)  whether the impairment prevents the claimant from performing past relevant work; and

(5)  whether the impairment prevents the claimant from doing any other work.

20 C.F.R. §§ 404.1520 & 416.920.

The claimant bears "the initial burden of proving that [his] impairments prevent [him] from performing [his] former type of work." Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985). Once

4

the claimant has shown an inability to perform his previous work, the burden shifts to the Commissioner to show that there are other jobs in the national economy that he can perform.  See Vazquez v. Secretary of Health and Human Services, 683 F.2d 1, 2 (1st Cir. 1982).  If the Commissioner shows the existence of other jobs which the claimant can perform, then the overall burden remains with the claimant.  See Hernandez v. Weinberger, 493 F.2d 1120, 1123 (1st Cir. 1974); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

> Ultimately, a claimant is disabled only if his:
>
> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C.A. §§ 423(d)(2)(A) (West Supp. 2000) & 1382c (a)(3)(B) (West Supp. 2000).

With those principles in mind, the court reviews claimant's motion to reverse and the Commissioner's motion to affirm his decision.

## Background

This case is being reviewed for the second time. By order dated May 18, 1998, the prior decision of the Commissioner was reversed because the ALJ erred by making his disability determination without first obtaining the opinion of a vocational expert (in other words, by relying on the Medical Vocational Guidelines, or the "Grid").[3] The case was remanded to permit testimony by a vocational expert. Having been denied benefits on remand, claimant seeks review.

Pursuant to this court's Local Rule 9.1(d), the parties have filed a Joint Statement of Material Facts, which is part of the court's record. In addition, a recitation of the pertinent facts was provided in the court's May 18, 1998, order. Therefore, as a

---

[3]The May 18, 1998 order, which is docketed under Civil No. 97-343-M, may also be found at pages 335 to 350 of the official Social Security Administration ("SSA") record filed with the court in this case. (Cites to the record in this order are indicated by "R. at ___.")

detailed factual statement need not be repeated in this order, only the facts relevant to the court's decision are noted here.[4]

I.    Claimant's Background and Medical Condition

Claimant was forty-seven years old at the alleged onset of his disability and fifty-one at the time the ALJ rendered the decision under review.  He has either a tenth or twelfth grade education[5] and worked for twenty-four years in the construction

---

[4]These fact are taken from the Joint Statement of Material Facts as supplemented by the record.

[5]The parties' joint statement of material facts stipulates that claimant has a twelfth grade education.  The ALJ's decision, however, states that claimant has a tenth grade education.  The record shows that at times claimant testified that he had completed twelve years of education and graduated from high school, while at other times, he appears to have told his examining physicians that he quit high school in the tenth grade and either never got his GED or got it while in the service.  The court need not resolve this discrepancy, however, in order to reach its decision.

industry as a masonry pipe-layer/pipe-fitter.

Claimant alleges that he became unable to work on February 1, 1994. He testified that he was working in Arizona at the time and, while at home preparing to go to work he felt a numb, tingling sensation in his left foot that traveled up the entire left side of his body. Claimant first sought medical attention after returning to New Hampshire approximately three months later. He presented at the Veterans Administration ("VA") hospital on May 13, 1994, reporting that he thought he had suffered a stroke three months earlier and complaining of persistent numbness and weakness on his left side. On physical examination, the attending physician noted that claimant's cranial nerves and his motor and sensory systems were all intact. Claimant's blood pressure, however, was measured at 218/148, and he admitted to both alcohol abuse and to smoking two packs of cigarettes a day. Claimant was diagnosed with alcohol-related hypertensive symptoms, for which he was prescribed Quinopril and advised to stop drinking.

At a follow-up visit on May 16, 1994, a CT scan of claimant's head was taken which revealed "an asymmetric 5 mm. area of reduced density within the internal capsule, which is not felt [by the reporting radiologist] to be of clinical significance." (R. at 207.) Claimant continued to be treated for hypertension and to complain of left-side numbness and weakness.

On July 29, 1994, claimant was seen by Hans W. Standow, M.D., at the request of the Social Security Administration ("SSA"), for a psychiatric evaluation. Dr. Standow noted that claimant walked normally, had well-preserved motor coordination and no significant pathology in motor activity. The doctor concluded that "[f]rom a psychiatric viewpoint, [claimant's] symptoms are only mild and in no way render[] him dysfunctional," but noted that "[h]ow disabling his physical condition is could only be determined by a thorough neurological examination, which would likely be indicated and helpful." (R. at 222.)

On August 16, 1994, claimant was seen by a VA practitioner for a general medical examination. Claimant presented with no

9

complaints.  His posture and gait were noted to be normal, and an examination of his musculoskeletal systems showed no limitations of motion.  The examiner's notes further stated: "Neurological examination reveals motor strength is 5 out of 5 both upper extremities and lower extremities.  There is good repetitive motion with the fingers.  Reflexes of the brachioradials, biceps, triceps, patella and ankle are approximately 3+ left and right." (R. at 214.)

Claimant was referred by the SSA to Robert Thies, M.D., for a neurologic independent medical examination.  Claimant saw Dr. Thies on March 28, 1995, at which time he reported no substantial change in his symptoms since his first visit to the VA hospital. Dr. Thies noted:

> On motor examination there is clumsiness of rapid alternating movements of the left hand.  There is mild downward drift of the extended left upper extremity. Reflexes are absent.  The left plantar is upgoing; the right is downgoing.  There is a question of a patch and impersistent decrease in appreciation of touch over the left hand as compared to the right.  On gait he favors his left lower extremity slightly.

(R. at 226.)  Dr. Thies' stated impression was that "[t]he described symptoms and current examination are compatible with

10

deep right cerebral dysfunction." (R. at 226.) Dr. Thies observed that claimant's hypertension made him a candidate for lacunar stroke, and noted that "[t]he CT scan in the past [i.e., May 16, 1998,] may well have shown a right lacunar stroke, although the description is somewhat ambiguous." (R. at 226.) Dr. Thies concluded that claimant "appears to have persistent sensory and motor difficulty with his left body secondary to the event of February 1994." (R. at 226.)

On April 7, 1995, claimant was seen by Victor Gordan, M.D., his primary care physician at the VA. Dr. Gordan noted no changes or new developments in claimant's condition since his last visit in October, 1994. His handwritten office notes appear to describe claimant's condition as "[status/post] stroke - L[eft] hemiparesis/mild." (R. at 219.)

Another neurological evaluation of claimant was conducted by Henry D. Astarjian, M.D. on May 19, 1995. Dr. Astarjian's motor examination of claimant showed "a definite drift in the left upper extremity with pronation indicating weakness of the left upper extremity." (R. at 239) Weakness in the left lower

11

extremity was also noted, and a sensory examination revealed at least fifty percent less feeling of a pin prick on claimant's left side than his right. Other sensory modalities, however, such as vibration and proprioception, were found to be intact, and claimant's gait and stance were noted to be within normal limits. The results of a head CT scan and an EEG were also within normal limits.

Dr. Astarjian concluded his report with the following opinion:

> That the patient has had stroke involving the left body is of no doubt. There is moderate degree of weakness in the left upper and lower extremities and this combined with the long-tract signs, such as extensor plantar reflex and hyperflexia on the left side document not only the stroke, but the fact that his left-sided weakness is a hindrance for him to go back to pipe fitting or any kind of work which involves physical strength and endurance. In that sense the patient is disabled, but can he do some kind of a desk job to earn a living? [T]he answer to that question is yes.

(R. at 240.)

On July 31, 1995, claimant was examined by Richard Berke, Ph.D., at the SSA's request. Dr. Berke conducted an interview and mental status evaluation and administered tests to determine

12

an intelligence profile.  Dr. Berke noted that claimant "said that his 'brain works fine,' but he has weakness in the left side of his body, and he cannot do physical work without getting tired, especially when he stands on his feet."  (R. at 228.)

Claimant next saw Dr. Gordan on January 17, 1996.  Dr. Gordan ordered a head CT scan which showed "confirmation of a right lacunar infarct which is essentially unchanged since 05/16/94."  (R. at 251 (emphasis omitted).)  Dr. Gordan also completed a medical assessment of ability to do work-related activities for claimant on January 17, 1996.  Dr. Gordan stated that claimant could do no lifting or carrying, no standing, two to three hours of sitting, and no climbing, balancing, stooping, crouching, kneeling, or crawling in an eight hour day, all due to left-side hemiparesis.  Dr. Gordan also stated that claimant's ability to see, hear and speak were not affected by his stroke, but his ability to reach, handle, feel and push/pull were.  Dr. Gordan also noted that claimant's impairment necessitated environmental restrictions as to height, moving machinery,

13

temperature extremes, noise and vibration, but not as to chemicals, dust, fumes or humidity.

Dr. Gordan saw claimant again on July 16, 1996, January 23, 1997, August 6, 1997, and January 3, 1998, at which times no new developments were noted.  By letter dated November 18, 1998, Dr. Gordan was asked by claimant's attorney to indicate whether the physical limitations noted in Dr. Gordan's January 17, 1996 medical assessment of claimant's ability to do work-related activities still existed.  Dr. Gordan answered affirmatively.

II.  The Administrative Hearing.

A hearing was held before the ALJ on November 19, 1998. When asked whether there had been any changes in his strength or increase in weakness on his left side, claimant testified that "[i]t seems to be more fatigue than before."  (R. at 305.)  He stated that the fatigue he experienced required him to lay down to rest for an hour in the morning and an hour in the afternoon. He also stated that he would occasionally walk for exercise but had to take breaks and sit down for awhile before continuing his walk.

The ALJ questioned the vocational expert about a hypothetical person, aged 50, with a tenth grade education and heavy or very heavy work experience, who could lift twenty pounds maximum, ten or fifteen pounds on a daily basis.  The vocational expert was asked to assume that hypothetical worker suffered a stroke, resulting in the following limitations:

> [I]n terms of the nondominant upper extremity
> limitations, the use of the left upper extremity
> particularly the hand and finger for repetitive,
> constant grasping fingering would be able to use the
> left hand for balancing and . . . occasional lifting of
> more gross objects but certainly is not going to be

15

able to do certainly keyboard activities and assembly types of activities or even repetitive gross manipulations with the upper left hand.

(R. at 322.)

The vocational expert testified that, under those assumptions, the hypothetical worker would not be able to return to his previous heavy-lifting jobs, but that other jobs existed in the national and local economies that the worker could perform, such as cashier, light exertional level (800,000 jobs nationally/3,000 locally); cashier, sedentary (200,000/1,000); information clerk, light exertional level (46,000/100); small product packaging (90,000/350); office helper (80,000/200); general clerical, light exertional level (150,000/350); general clerical, sedentary (100,000/250); office (i.e., not postal service) mail clerk (75,000/300); and telephone answering (92,000/300). The vocational expert testified that an additional limitation on standing and walking more than a short distance might affect the ability to perform the mail clerk job, but that the jobs listed generally would not require walking long distances or constant standing in one position, but could be

16

performed sitting or standing and would allow the worker to change position for a few seconds or minutes before resuming his usual position.

Claimant's attorney asked the vocational expert to assume that a hypothetical worker with a limited education could not lift or stand, could not sit for more than two or three hours in an eight hour day, could not climb, balance, stoop, crouch, kneel, or crawl, could not use, handle or feel with his left upper extremity, and could not work near heights, moving machinery, extremes in temperature, noise, fumes or vibration. The vocational expert testified that with those limitations, the hypothetical worker could not perform any of the jobs she had previously identified.

Claimant's attorney then asked the vocational expert to return to the ALJ's hypothetical worker and opine whether that worker could perform any of the jobs previously identified if the worker had to take two to three rest breaks, not part of the normal work routine, lasting from one half to one hour each, due

17

to fatigue. The vocational expert testified that under those assumptions, all of the jobs would be precluded.

III. The ALJ's Decision.

The ALJ reached his decision at step five of the sequential analysis. The ALJ disregarded Dr. Gordan's assessment of claimant's physical limitations finding that "Dr. Gordon's [sic] assessment as to the profound physical limitations of the claimant is inconsistent with the claimant's activities, with other medical assessments, and the totality of the record." (R. at 279.) The ALJ therefore gave Dr. Gordan's assessment no weight. The ALJ also found:

> [T]he claimant's statements asserting disability are out of proportion with the record as a whole and are, therefore, not entirely credible in light of the claimant's own description of his activities and life style, the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of the treating and examining practitioners, and findings made on examination.

(R. at 281.) The ALJ concluded, based on the vocational expert's testimony, and in light of claimant's age, education, experience

18

and residual functional capacity ("RFC"), that while claimant could not return to his former occupation, he could make the adjustment to other work that exists in significant numbers in the national economy. Accordingly, the ALJ found that claimant was not disabled within the meaning of the Act.

## Discussion

Claimant argues that the vocational expert's opinion cannot constitute substantial evidence in support of the ALJ's decision because the hypothetical question the ALJ posed to the vocational expert did not include all of the limitations on claimant's ability to work.

> [I]n order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities. To guarantee that correspondence, the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions.

Arocho v. Secretary of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). Thus, if the ALJ omits a significant functional

limitation from the hypothetical posed to the vocational expert, the ALJ cannot rely upon the vocational expert's answer as the reason for denying benefits.  See Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994).

Claimant first argues that the ALJ's hypothetical failed to include any postural limitations - i.e., restrictions on climbing, balancing, stooping, crouching, kneeling, and crawling. In a related argument, claimant asserts that the ALJ erred in rejecting his treating physician's opinion as to his residual functional capacity.

While the SSA generally gives more weight to the opinion of a treating physician than that of a medical consultant, a treating physician's opinion is entitled to controlling weight only if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  If those conditions are not met, the SSA will consider a number of factors, including the

20

supportability and consistency of the treating physician's opinion, to determine what weight to give it.  Id.

The court finds that the ALJ did not err in rejecting Dr. Gordan's findings as inconsistent with the record as a whole. With respect to postural limitations, Dr. Gordan stated that claimant could do no climbing, balancing, stooping, crouching, kneeling, or crawling.  However, none of the physicians who examined claimant noted any limitations of motion that would completely limit his abilities to stoop, crouch, kneel, crawl or climb.  To the contrary, the general medical examination of claimant conducted on August 16, 1994 showed the following:

> Musculoskelotal system examination shows the left and right shoulder has no limitation of motion.  The left shoulder has normal abduction and normal extension and flexion, as does the right shoulder.  Examination of both elbows shows no limitation of motion.  Examination of the spine shows the flexion forward of 90 degrees, extension backward of 35 degrees and movement laterally left and right of 40 degrees.  Examination of the hip shows no ormalities [sic; abnormalities?]  Examination of the left and right knees show normal flexion and extension.  There is normal ankle dorsal flexion and plantar flexion.

(R. at 214.)

21

Of course a number of physicians noted weakness and sensory deficits on claimant's left side, as well "clumsiness of rapid alternating movements of the left hand." (R. at 226.) However, there is no suggestion that these impairments would prevent claimant from performing the listed postural functions. Indeed, a functional capacity assessment of claimant by a medical consultant for the SSA, dated April 5, 1995, indicated that claimant could engage in all postural functions occasionally (defined as "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)"). (R. at 116.)

The practitioner who examined claimant on August 16, 1994, also noted that "[t]he patient is able to walk toes and heels," (R. at 214), which tends to contradict a finding of complete inability to balance. Claimant did testify that he started using a cane in 1996 for balance, as his left leg would sometimes "just go right out from under [him]." (R. at 305.) He stated, however, that he had not fallen while using the cane.

As Dr. Gordan's medical assessment was inconsistent with the record as a whole, the ALJ was entitled to disregard it. He then

had in the record before him a residual functional capacity assessment by medical consultant Burton A. Nault, M.D., dated July 21, 1994, that found that no postural limitations had been established, and a medical consultant's assessment dated April 5, 1995, that limited all postural functions to an occasional basis. Since the ability to perform all postural functions at least occasionally would leave the light and sedentary occupational bases largely intact, the ALJ's failure to include those limitations in his hypothetical to the vocational expert does not require reversal. See SSR 85-15, 1985 WL 56857, at *6-7 (S.S.A. 1985) (discussing climbing, balancing, stooping, crawling and

23

kneeling)[6]; SSR 83-14, 1983 WL 31254, at *2 (S.S.A. 1983)

(discussing climbing, crouching and stooping).[7]

---

[6]      Limitations in climbing and balancing can have varying effects on the occupational base, depending on the degree of limitation and the type of job.  Usual everyday activities, both at home and at work, include ascending or descending ramps or a few stairs and maintaining body equilibrium while doing so.  These activities are required more in some jobs than in others, and they may be critical in some occupations.  Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work.  Certain occupations, however, may be ruled out; e.g., the light occupation of construction painter, which requires climbing ladders and scaffolding, and the very heavy occupation of fire-fighter, which sometimes requires the individual to climb poles and ropes. . . .
. . . If a person can stoop occasionally . . . in order to lift objects, the sedentary and light occupational base is virtually intact. . . . [In addition,] limitations on the ability to crawl would be of little significance in the broad world of work.  This is also true of kneeling . . . .

SSR 85-15, 1985 WL 56857, at *6-7

[7]"Relatively few jobs in the national economy require ascending or descending ladders and scaffolding. . . . [T]o

24

With respect to exertional limitations, the ALJ could have found Dr. Gordan's assessment inconsistent with other substantial evidence in the record, including claimant's testimony as to his daily activities. For instance, claimant consistently noted on his activities of daily living forms that on an average day he would take "short walks" (R. at 99 (May 31, 1994); R. at 153 (June 23, 1995)). He also testified as late as November 19, 1998, that he tried to "walk a little bit" for exercise, albeit with rest breaks. (R. at 320.) The ALJ could therefore reject Dr. Gordan's opinion that claimant could not walk or stand at all.

Similarly, the evidence did not support Dr. Gordan's opinion that claimant could not lift anything at all. Certainly the weakness in claimant's left side was well documented, and he testified that his left hand would tire and become useless after five minutes of trying to hold something, even a piece of bread.

perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally." SSR 83-14, 1983 WL 31254, at *2

25

It was also documented, however, that claimant is right-handed and that he could perform household chores that presumably required some lifting. For instance, he testified on December 7, 1995, that he could "pick stuff up and throw it away, or whatever," but that he needed help with "[a]ny major thing." (R. at 53.) Thus, he testified that he was able to take care of the cleaning, vacuuming and dusting of his apartment, "but as far as moving anything around or anything, I can't." (R. at 53.) The ALJ could also weigh Dr. Gordan's assessment of claimant's sitting ability in light of claimant's testimony that while he experienced numbness and ache after sitting for fifteen or twenty minutes, he was able to relieve it by standing for a few seconds or even by shifting his position in the chair.

Having discounted Dr. Gordan's RFC assessment as inconsistent with other evidence, the ALJ could rely on the assessments of the medical consultants, the most recent of which (April, 5, 1995) determined that claimant could lift twenty pounds occasionally, ten pounds frequently; stand and/or walk about six hours in an eight hour work day; sit about six hours in

26

an eight hour work day; and push and/or pull without limitation.[8]

See Gray, 760 F.2d at 373 ("[O]pinions of consulting physicians concerning a claimant's physical condition are entitled to weight.").[9]  The court therefore finds no reversible error in the ALJ's RFC determination.

Finally, claimant argues that the ALJ's hypothetical failed to include a limitation for fatigue, which, once brought to the vocational expert's attention by claimant's lawyer, was found to preclude all occupations.  The ALJ found it "credible that

[8]An earlier assessment, dated July 21, 1994, determined that claimant could lift fifty pounds occasionally, twenty-five pounds frequently; stand and/or walk about six hours in an eight hour work day; sit about six hours in an eight hour work day; and push and/or pull without limitation.

[9]Claimant argues that the ALJ impermissibly substituted his opinion as to claimant's functional limitations for Dr. Gordan's, and that as a lay person, "'the ALJ was simply not qualified to interpret raw medical data.'"  (Claimant's Br. at 9 (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).)  The court finds no indication, however, that the ALJ interpreted raw medical data.  Rather, although the ALJ does not explicitly cite the April 5, 1995 medical consultant's assessment, the court cannot help but notice that the ALJ's RFC determination matches that assessment exactly, with the added restrictions that claimant cannot "perform rapid, alternating movements with his left (nondominant) hand and cannot walk more than one-half hour at a time."  (R. at 284.)

[claimant] would experience some numbness on his left side," but concluded that "the claimant's statements asserting disability are out of proportion with the record as a whole and are, therefore, not entirely credible."  (R. at 281.)

The court finds no reversible error in the ALJ's determination.  The ALJ focused on the inconsistency between claimant's allegations of disabling fatigue and his stated activities of shopping, showering, light cleaning, preparing meals and taking short walks.  The ALJ also could have found claimant's alleged fatigue level inconsistent with various portions of the medical record.  For instance, in the general medical examination conducted on August 16, 1994, claimant underwent a cardiovascular test requiring exercise, after which no fatigue was noted.[10]

---

[10]This case may therefore be contrasted with McMillian v. Schweiker, 697 F.2d 215, 221 (8th Cir. 1983), cited by claimant, in which the court found that the claimant/stroke victim's "complaint of fatigue was at least partially corroborated by" a doctor's finding that the claimant's "disability rendered him unable to tolerate a treadmill exercise test."

With regard to mental fatigue, Dr. Berke's examination of claimant revealed that his "[a]ctivity level was normal and appropriate; persistence was observed." (R. at 228.) Dr. Astarjian opined after examining claimant that while he could not perform work that required "physical strength and endurance," he could maintain a "desk job." (R. at 240.) It may also be noted that in all of the physicians' notes in the record, there is only one mention of a complaint of fatigue by claimant, on January 17, 1996. Since the ALJ did not err in discounting claimant's subjective complaints of fatigue, his failure to include that limitation in his hypothetical question to the vocational expert does not constitute error. See Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994) (noting that where "the ALJ found that [claimant's] subjective complaints of fatigue were not supported by the record as a whole . . . he did not need to include those factors in the hypothetical to the vocational expert").

Conclusion

For the foregoing reasons, the claimant's motion to reverse the decision of the Commissioner (document no. 9) is denied and the Commissioner's motion for order affirming the decision of the Commissioner (document no. 10) is granted.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

July 25, 2000

cc:   Raymond J. Kelly, Esq.
      David L. Broderick, Esq.