**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-2073

ARCON, INCORPORATED,

Petitioner,

versus

OCCUPATIONAL SAFETY & HEALTH REVIEW
COMMISSION; SECRETARY OF LABOR,

Respondents.

On Petition for Review of an Order of the Occupational Safety and
Health Review Commission. (99-1707)

Argued: May 26, 2005     Decided: June 23, 2005

Before WILKINS, Chief Judge, and WILKINSON and GREGORY, Circuit
Judges.

Petition denied by unpublished per curiam opinion.

**ARGUED:** David Harlen Sump, CRENSHAW, WARE & MARTIN, P.L.C.,
Norfolk, Virginia, for Petitioner. John Robert Shortall, Office
of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington,
D.C., for Respondent. **ON BRIEF:** Stuart P. Sperling, CRENSHAW, WARE
& MARTIN, P.L.C., Norfolk, Virginia, for Petitioner. Howard M.
Radzely, Solicitor of Labor, Joseph M. Woodward, Associate
Solicitor for Occupational Safety and Health, Charles F. James,
Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF
LABOR, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

Arcon, Incorporated petitions for review of an order of the Occupational Safety and Health Review Commission (Review Commission) insofar as the order affirmed the findings of an administrative law judge (ALJ) imposing sanctions for violation of asbestos cleanup regulations. Finding no error, we deny the petition for review.

I.

Arcon is an asbestos removal contractor based in Norfolk, Virginia. In February 1999, Arcon contracted to remove approximately 1,500 feet of bulkhead panels from the M/V CAPE LOBOS, berthed in Wilmington, North Carolina. Arcon's work plan for the job described the removal of the panels as "Class II Asbestos Work," J.A. 365, meaning that it involved activities such as "the removal of asbestos-containing wallboard, floor tile and sheeting, roofing and siding shingles, and construction mastics," 29 C.F.R. § 1915.1001(b) (2004). The panels were located on the boat deck, the poop deck, and the upper deck.

Arcon's crew--supervisor David Poole, Joe Boone, and Daryl Jefferson--arrived at the site on March 8, 1999. At that time, they observed that there was already a great deal of dust in the work area. When the Arcon crew began work on March 9, air samples were taken by Warren Plautz, a field technician for Phoenix Envirocorp, which had been retained to conduct monitoring at the

site. Plautz's pre-work sample indicated a fiber count of .065/cubic centimeter--over the permissible exposure limit (PEL) of .01. Plautz's next sample, called an "excursion sample," was taken from inside the work area on the boat deck and indicated a fiber count of 3.49/cubic centimeter. This was above the permissible excursion limit of 1.0.[1] These high fiber counts were evidently the result of the friability of the wallboard--according to Boone, "if you touch[ed] [the panels], the stuff would just fall out," J.A. 150--and Poole's use of a reciprocating saw (a "Sawzall") to remove wallboard from around a pipe.

Plautz informed Poole of the high fiber counts, and then he informed the general manager of Phoenix Envirocorp, Thomas Green. Green consulted Arcon's safety manager, C.J. Morey, and advised her to shut down the project. When Arcon's president, Arthur Hawthorne, called Poole to discuss the situation, Poole stated that the sample results were high because of the way he removed the panels and possibly because a piece of the material fell on the air monitoring equipment. Poole did not inform Hawthorne that the panels were breaking apart or that he had used the Sawzall to remove one of the panels. After this conversation, it was Morey's

---

[1]This test result was initially reported as 35.5 fibers/cubic centimeter, an impossibly high level. Although this caused some confusion, it appears that everyone involved agreed that the problem was likely a misplaced decimal point.

understanding that the boat deck would be cleaned up and clearance samples would be obtained before the work continued.

That night, Poole traveled to Norfolk to obtain a negative air machine, additional plastic sheeting, and an airless water sprayer. The following morning, March 10, the crew proceeded with work on the poop deck without first obtaining clearance samples from the boat deck. Plautz's air samples from the poop deck indicated that fiber counts were within the PEL, but Green nevertheless reported to Morey that he was concerned that Poole had not finished cleaning the boat deck. However, the work on the poop deck apparently proceeded without incident.

At the beginning of the day on March 11, Poole asked Gregory Baccari, the official responsible for approving the work area, to approve the containment area on the upper deck. Baccari refused, pointing out that the plastic sheeting that had been used to contain the area had tears, holes, and gaps, and that no sheeting had been placed on the ceiling, which was open as the result of the previous removal of ceiling tiles. Baccari left the area, but when he later returned he found that the crew had proceeded with the work without correcting the problems. According to Baccari, the area was "anywhere from ankle deep to knee deep" in broken panels and there was visible dust in the air. Id. at 81.

Later that morning, Allen Mosby, a compliance officer with the North Carolina Department of Health and Human Services, boarded the

4

CAPE LOBOS in response to an anonymous complaint about Arcon's work practices. Mosby took numerous photographs of the dust, debris, and holes in the plastic sheeting. Among other things, Mosby noted that it did not appear that the Arcon crew was wetting down the panels prior to wrapping them in the plastic sheeting. Mosby ordered the site to be shut down that afternoon. He also notified the Occupational Safety and Health Administration (OSHA) of possible regulatory violations.

OSHA compliance officer Andrea Reid investigated the site and issued two citations containing a total of 12 items. Citation 1 alleged four serious violations of OSHA regulations, denoted as Items 1, 2a, 2b, and 3. Citation 2 alleged eight willful violations of OSHA regulations, denoted Items 1a-c and 2a-e. Reid imposed a total fine for the violations of $108,500.

Arcon sought review by an ALJ, who vacated three of the violations, reduced four of the willful violations to serious violations, and reduced the fine to $40,450. Arcon sought additional review from the Review Commission, which vacated another three items and reduced the fine to $36,200. Arcon now seeks further review.

## II.

The Secretary of Labor bears the burden of proving the violation of an OSHA standard. To do so, she must demonstrate "(1) the applicability of the standard, (2) the employer's noncompliance

5

with the terms of the standard, (3) employee access to the violative condition, and (4) the employer's actual or constructive knowledge of the violation." N&N Contractors, Inc. v. OSHRC, 255 F.3d 122, 126 (4th Cir. 2001). We must affirm the holdings of the Review Commission if they are supported by substantial evidence in the record as a whole. See id. at 125. "Substantial evidence is more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).

## A.

Arcon first argues that the Secretary failed to establish that the cited standards apply because she did not prove that the fibers in the air were asbestos fibers, as opposed to some other kind of fiber. The Review Commission rejected this claim in a single sentence: "The argument is not a valid challenge to the applicability of the cited standards, whose applicability does not depend on whether asbestos dust is present." J.A. 456.

The Review Commission was correct. The pertinent regulatory provision, 29 C.F.R. § 1915.1001 (2004), "regulates asbestos exposure in all shipyard employment work ..., including but not limited to ... [r]emoval or encapsulation of materials containing asbestos." 29 C.F.R. § 1915.1001(a)(2). Arcon admits that the wallboard panels contained amosite asbestos, and Mosby testified to

6

this fact.[2]  Accordingly, the regulations apply to the work Arcon was doing.

One of the citations--alleging a failure to provide adequate respiratory protection--relies on a regulatory standard that applies, as is relevant here, to certain forms of Class II asbestos work.   See 29 C.F.R. § 1915.1001(h)(1)(ii), (iv) (requiring respirator protection "[d]uring all Class II work where the ACM [asbestos-containing material] is not removed in a substantially intact state" or when no negative exposure assessment is supplied). Substantial evidence supports the determination that Arcon's work on the CAPE LOBOS was Class II asbestos work, which is defined as "activities involving the removal of ACM ... includ[ing], but ... not limited to, the removal of asbestos-containing wallboard."  29 C.F.R. § 1915.1001(b).  As noted above, Arcon admits that the wallboard it removed from the CAPE LOBOS contained amosite asbestos.  Its removal therefore was Class II work.

In light of the clear applicability of the regulations, Arcon's assertion that the Secretary failed to prove the presence of airborne asbestos fibers appears actually to be a challenge to the finding of a violation of the applicable standards.  Such a

---

[2]On appeal, Arcon contends that Mosby's testimony--that tests of the wallboard "came back am[o]site," J.A. 36--was improper because Mosby was not an "expert."  Arcon did not challenge his testimony on this basis during administrative proceedings, however, and thereby waived this claim.  See 29 U.S.C.A. § 660(a) (West 1999).

7

challenge would apply only to Citation 2, Item 1c, which alleges a failure to use a proper respirator. Since the type of respirator required varies according to the amount of airborne asbestos, see 29 C.F.R. § 1915.1001 tbl.1, the Secretary was required to demonstrate the presence of airborne asbestos fibers in the workplace in order to establish a violation.

The Secretary's evidence on this point consisted of the results of Plautz's environmental monitoring. Plautz employed phase-contrast microscopy (PCM) to count airborne fibers. In the absence of other information, OSHA regulations require any fiber at least 5 micrometers long with a 3:1 or greater length/width ratio to be counted as an asbestos fiber. See 29 C.F.R. § 1915.1001 appx. A(13)(a), (b). Although PCM does not definitively establish a given fiber as asbestos, see id. appx. B § 1.3, the regulations provide that PCM is adequate to establish the presence of airborne asbestos, see id. § 1.2. However, the regulations also provide that a differential counting method, which will positively identify fibers as asbestos, "should be used if discrimination is desirable." Id. § 6.7.

Arcon maintains that the Secretary failed to carry her burden of proof with respect to Citation 2, Item 1c because she did not employ a differential counting method to positively demonstrate the concentration of airborne asbestos fibers. This argument is without merit. The Review Commission has explicitly stated that

8

compliance with the respirator standard "is premised on the painstaking, microscopic measurement of samples required" by PCM. Sec'y of Labor v. Dec-Tam Corp., 1993 WL 27401, at *13 (O.S.H.R.C. Jan. 19, 1993). This evidence is thus sufficient to meet the Secretary's burden of making a prima facie case for a violation and thereby to shift the burden to Arcon to rebut. See Sec'y of Labor v. EBAA Iron, Inc., 1995 WL 49331, at *1 (O.S.H.R.C. Feb. 7, 1995). Arcon has presented no evidence to rebut the sampling results.

B.

Arcon next maintains that the Secretary failed to meet her burden of proof with respect to Citation 1, Item 2b. This item charged Arcon with failing to conduct additional monitoring after a change in process, namely, the use of the Sawzall to cut the wallboard panels on March 9. There is no question that the use of the Sawzall greatly increased the amount of airborne fibers in the work area. Arcon maintains, however, that this citation should be vacated because the use of the Sawzall was abandoned after March 9. According to Arcon, its return to its originally planned work practices absolved it of the need to conduct any additional monitoring.

Arcon did not raise this challenge to the citation before the Review Commission.[3] Accordingly, it has waived review of this

---

[3]Arcon instead argued that the citation should be dismissed because it resulted from unforeseeable employee misconduct. See generally N&N Contractors, 255 F.3d at 128 n.3 (discussing employee

9

issue.  See 29 U.S.C.A. § 660(a) (West 1999) ("No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). Additionally, even if this claim were not waived, the regulation does not support Arcon's position; it requires additional monitoring after a change in practice, without regard to whether monitoring may actually be needed.  See 29 C.F.R. § 1915.1001(f)(4)(ii).  And, Arcon cites no other authority in support of its argument.

C.

Item 2c of Citation 2 alleged that on March 11, Arcon failed to place "[c]ritical barriers"--here, polyethylene sheeting--at all openings to the work area.  29 C.F.R. § 1915.1001(g)(7)(ii)(A).  In particular, the citation noted that (1) Arcon failed to use barriers over open portholes, (2) the sheeting that Arcon used "did not cover all open areas," J.A. 15, and (3) Arcon failed to use impermeable dropcloths on the floor of the upper deck.  This citation was based on Mosby's observations and photographs of the work area on March 11.  Arcon asserts that this citation should be vacated because (1) the Secretary failed to prove any migration of airborne asbestos, and (2) it was prevented from proving the efficacy of the methods it did use because Mosby shut down the work

misconduct defense).

10

on March 11 before any monitoring could be employed. See 29 C.F.R. § 1915.1001(g)(7)(ii)(B) (providing that alternative barrier methods may be used if the efficacy of those methods is "verified by perimeter area monitoring or clearance monitoring").

Arcon's first assertion is plainly without merit. The standard requires the use of certain methods, and thus a violation of the standard is established by the failure to use those methods.

Arcon's second argument fails because there is no evidence that it performed any perimeter area or clearance monitoring, or that Mosby prevented it from doing so. In the first place, the Arcon crew began work at approximately 8:30 a.m., and Mosby did not shut down the work until well after lunch. There is no dispute that Arcon did not perform any perimeter area monitoring during the five or more hours that it worked on March 11. And, although Arcon now asserts that it would have performed clearance monitoring if Mosby had not shut down the job, there is no evidence in the record that supports this assertion. Accordingly, there is no basis for vacating this citation.

### III.

Finally, Arcon challenges the amount of the penalty imposed on it as an abuse of discretion. See generally 29 U.S.C.A. § 666(j) (West 1999) (discussing authority to impose civil penalties and relevant considerations as to the amount of penalty). Arcon's argument on this point rests entirely on its previous assertion

11

that the Secretary failed to prove the presence of airborne asbestos fibers. As discussed above, however, the use of phase contrast microscopy is an accepted method for determining the presence of airborne asbestos fibers. The Secretary therefore met her burden, and it was up to Arcon to challenge the validity of the Secretary's evidence. Since Arcon failed to do so, there is no basis on which to reduce the penalties imposed.

## IV.

For the reasons set forth above, we deny the petition for review.

<u>PETITION DENIED</u>

12